THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS EDWARDS, Defendant-Appellant.

First District (6th Division)   No. 1—06—3741

Opinion filed February 13, 2009.

Adam Bourgeois and Barbara Klein, both of Bourgeois & Klein, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, and John E. Nowak, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McBRIDE delivered the opinion of the court:

Defendant, Dennis Edwards, was charged with the first degree murder of Ada Allen. Defendant's first trial ended when the trial court declared a mistrial without prejudice based on a discovery violation committed by defense counsel. The trial court subsequently denied defendant's motion to dismiss the charges against him based upon

principles of double jeopardy. Defendant now appeals, arguing that his right not to be placed twice in jeopardy for the same offense was violated when the trial court granted the State's motion for a mistrial without prejudice and when the court denied defendant's motion to dismiss the charges against him. For the reasons that follow, we affirm.

The State's case included the testimony of two Chicago police officers who arrived on the scene, the backyard of a residential building, and observed defendant straddling a female and holding her in a "choke hold." The officers pulled defendant off of the victim, who then "flopped" facedown onto the grass. The officers then observed that the victim was not moving, that her tongue was hanging out of her mouth, and that her eyes were "rolled back in her head." Defendant was taken to the police station and, when an ambulance arrived, the victim was pronounced dead.

Rachel Schram was called as a witness and testified that during the early morning hours of March 6, 2004, she accepted a ride from the victim, who was on her way to defendant's apartment. While driving to that location, Schram smoked crack cocaine with the victim. When they arrived at defendant's apartment, the victim pounded on defendant's door and exchanged words with defendant through his apartment door over the fact that there was another woman in the apartment. Defendant ultimately let Schram and the victim into the apartment and the victim and defendant then argued in defendant's bedroom while the victim was "throwing things" around the room and at defendant. Defendant was asking the victim for his keys back and eventually he and victim began to physically struggle. Schram acknowledged giving testimony before a grand jury that the victim also took an "i.d." from the other woman's purse and ran around the apartment and, according to Schram, the two women faced each other and were fighting while defendant tried to break up the fight. As defendant and the victim were subsequently exiting the apartment, defendant was pushing the victim and attempting to stop her from opening the door. Schram also observed the victim swing her purse once at defendant just as the victim and defendant exited the apartment. The victim and defendant ultimately exited the apartment and, by the time Schram arrived outside behind them, defendant was on top of the victim, choking her. Schram specifically observed that defendant had one arm around the victim's neck while he was holding her facedown on the ground with his other arm. She heard defendant say, "[d]on't move, or I'm going to kill you." The victim was initially "moving her legs a little bit" and gasping for air but within two or three minutes she stopped moving.

The State also presented the testimony of Cook County assistant medical director Dr. Nancy Jones. Dr. Jones performed an autopsy on the victim. Jones described the deceased as a 47-year-old African-American female who was "somewhat obese," suffered from hypertension, and had an enlarged heart and liver. Alcohol and cocaine were present in the victim's body at the time of the autopsy. The doctor's external examination of the victim revealed mud or dirt on the victim's lips and cheek, which suggested that the victim's mouth had been "facedown on the ground." The victim had an abrasion on her jaw and a small area of bruising running from her jaw to her ear, which Dr. Jones testified were consistent with the victim having been placed in a "choke hold." Regarding the lack of other external injuries to the victim, Dr. Jones explained that she had observed over 100 autopsies where the cause of death was strangulation and that in most situations where a "choke hold" was used to bring about the victim's death, there were "absolutely no marks" on the outside of the victim's body due to the manner in which the pressure is distributed around the neck. Dr. Jones ultimately concluded that the evidence was consistent with the victim having been placed in a "choke hold" and that in her opinion, within a reasonable degree of medical certainty, the victim died as a result of strangulation and the manner of death was homicide.

Defendant's first witness was his brother, Kenneth Edwards, who testified that his family owned the building in which defendant's condominium was located. Edwards described the layout of the condominium and testified that when he returned to the condominium after the incident, he observed damage to the bedroom "trim" that he had not previously seen.

Defendant then called Werner Spitz, a medical doctor and forensic pathologist. After reviewing his qualifications, the trial court found Dr. Spitz to be an expert in the field of forensic pathology. Dr. Spitz initially testified that he reviewed the records sent to him by defense counsel, including a police report and photographs from the scene of the crime and the victim's body. At this point, one of the prosecutors requested a sidebar and informed the court that there were notes of the witness that had previously been requested but not received. In chambers, the prosecutors informed the court that, while Dr. Spitz was testifying, they were reviewing documents that defense counsel had just tendered and discovered a letter from defense counsel to Dr. Spitz that had not previously been tendered to the State. In that letter, dated January 31, 2005, defense counsel indicated that she was enclosing documents and photographs which Dr. Spitz had indicated he would need to make a determination as to the cause of the victim's

death. Defense counsel then wrote that she wished to add additional facts which may be of assistance to Dr. Spitz. Counsel specifically wrote the following:

"1. I have interviewed a witness who observed a struggle between my client and the victim. Both were standing and the victim was repeatedly hitting my client with an object (which is believed to have been her purse) and with her hands.

2. My client appeared to be holding his hands up in a defensive position, but was not seen to be inflicting any blows.

3. The victim had been using crack cocaine and consuming alcohol just prior to the fight."

The prosecutors argued that they were unaware of any witness who had made the statements referred to in the letter, that the alleged facts contained in the letter were not contained in any of the police reports, and that there were no other accounts of such an interview with a witness. The prosecutors further argued that it was "egregious" for defense counsel not to have tendered the letter because Dr. Spitz relied upon the alleged facts contained in the letter in formulating his opinion. The prosecutors specifically referred to Dr. Spitz's February 21, 2005, opinion letter sent to defense counsel. In that letter, Dr. Spitz stated that the autopsy revealed only fingernail marks on the victim's jaw but no other signs of trauma, that the soft tissues of the victim's neck showed no evidence of injury, that cocaine and alcohol were found in a sample of the victim's blood, and that the victim was overweight and suffered from hypertension disease. At the end of the letter, in the section entitled "Conclusion," Dr. Spitz stated:

"1. Cocaine is a strong stimulant, especially when taken with alcohol;

2. Such stimulant effect of cocaine and alcohol would elevate pre-existing high blood pressure;

3. Hypertension is a common cause of sudden natural death, predominantly in the African-American race;

4. No evidence of strangulation was documented at autopsy; and

5. Evidence suggests that Ms. Allen-Scott started the altercation with Dennis Edwards by hitting him with an object, perhaps her purse, and hands.

It is my opinion that Ms. Allen-Scott died of a combination of factors, which include cocaine and alcohol ingestion, pre-existing hypertensive cardiovascular disease, obesity and excitement stress and agitation associated with an altercation."

The prosecution also informed the court that there were other documents that had not been tendered to the State, including a letter from Dr. Spitz to defense counsel regarding the doctor's fee for testifying, one or two pages of Dr. Spitz's handwritten notes, and a bill from Dr.

Spitz outlining the time he spent on the case and the corresponding charges.

Defense counsel responded that the unnamed witness was Cheryl Fields and that she had determined that Fields was not a credible witness and had communicated that to Dr. Spitz. The prosecutors argued that they had been tendered a "memorandum of interview" from a July 8, 2005, interview with Fields conducted by a defense investigator but that there was nothing in the memorandum about the victim having struck the defendant or the defendant having to defend himself. The trial court questioned defense counsel as to how the unnamed witness could have been Fields when defense counsel's letter to Dr. Spitz was dated January 31, 2005, and Dr. Spitz's opinion letter was dated February 21, 2005, but the interview with Fields took place on July 8, 2005. Defense counsel stated that her investigator interviewed Fields on July 8, 2005, but that counsel had spoken to the witness on other occasions and determined that she was not credible. The prosecution pointed out that there was no indication in defense counsel's January 31, 2005, letter to Dr. Spitz that the witness had changed her story or that counsel had found her to be incredible.

In response to the trial court's question as to why the letter had not been given to the State, defense counsel acknowledged that it was error not to have tendered the letter but that it did not "make any difference" because counsel was not calling Fields as a witness. The trial court responded that the information was provided to Dr. Spitz, whom defense counsel called as a witness, and that Dr. Spitz's opinion may have been based on the information contained in the letter.

The prosecutors noted that one of Dr. Spitz's opinions in the letter was that the victim started the altercation by hitting defendant with an object, perhaps her purse, and her hands, and that this was "clearly" based upon defense counsel's January 31, 2005, letter to Dr. Spitz. Defense counsel then stated that this information had in fact been provided by defendant, who related the same facts as had Fields. The prosecutors responded that defense counsel's letter referred only to a "witness," that all of defendant's statements had been taken by the State, and that the information found in defense counsel's letter was not related by defendant in any of his statements. The trial court pointed out that defense counsel's letter to Dr. Spitz did not indicate that defendant related the same information as had the "witness." Defense counsel stated that defendant related these facts during statements that were not reduced to writing. The prosecution then requested that Dr. Spitz be barred from testifying as an expert.

The trial court observed that Dr. Spitz's conclusion in "point number five" of his opinion letter, that the victim started the alterca-

tion with defendant, was "the exact thing" contained in defense counsel's letter to Dr. Spitz. Defense counsel responded that Rachel Schram, the State's witness, had already testified that the victim hit defendant with her purse. The prosecution countered that Schram made that observation as the victim and defendant were going out the door. The court stated that there had been testimony from Schram regarding the victim striking defendant with her purse but that there had been no testimony about the victim repeatedly striking defendant with her hands. Defense counsel stated that Dr. Spitz could be asked about these facts during cross-examination. The prosecution responded that to do so would be to insert facts from a witness who "doesn't exist" and also insert defense counsel as a witness because it was counsel who listed the facts in her letter to Dr. Spitz. The trial court stated that it did not believe it should strike the testimony of Dr. Spitz because defendant would "lose at that point" and "have a great appeal issue." The court also stated that it did not "find it harmless" and that the letter was "something basic that should have been tendered." The prosecution also argued that defense counsel could not "fix what [Dr. Spitz] based his opinion on" in the middle of trial. Defense counsel responded that she could ask Dr. Spitz if he based his opinion on any elements of the struggle. The prosecution stated that the information was contained in the doctor's report and the trial court pointed out that the facts were contained in the portion of Dr. Spitz's opinion letter entitled "Conclusion." Defense counsel responded that based upon her conversations with Dr. Spitz, she did not believe that the information regarding the victim repeatedly hitting the victim affected the doctor's conclusion regarding the cause of death.

After the trial court clarified that it would not strike Dr. Spitz as a witness, the prosecution requested a mistrial based upon "an expert who is going to testify to an opinion based on facts that were given to him only through a lawyer that were never tendered to [the State]" and based upon the fact that defense counsel had now become a witness in the trial. The prosecution also stated that if the court refused to declare a mistrial, it would ask the defense counsel be taken off the case because counsel had essentially become a witness who would not otherwise be subject to cross-examination.

The court then stated that defense counsel's failure to tender the letter was a discovery violation upon which the court would be willing to grant a mistrial. The court also stated that, alternatively, it would allow the prosecution to proceed with its cross-examination of Dr. Spitz. The prosecution again requested a mistrial and argued that it could not properly cross-examine Dr. Spitz because, without calling

defense counsel as a witness, there was no way to prove that it was Fields who gave conflicting stories to defense counsel and her investigator. In response to defense counsel's statement that the discovery violation was insufficient upon which to declare a mistrial, the court stated that defense counsel's failure to tender the letter she sent to Dr. Spitz, which included facts that the doctor wrote in his report, was a sufficient basis upon which to declare a mistrial.

Defense counsel argued that if she were to ask Dr. Spitz, he would say that the struggle was insignificant to his ultimate opinion. The court responded:

"He only writes a one-page letter and he makes sure that it's there. That's my problem. I'm not saying it was solely depended on, but obviously he depended [on] it in some way. It's a fact that he went out of his way to list on his report that is only a page long."

The prosecutor again requested a mistrial, clarifying that it should be without prejudice because the discovery violation was committed by defense counsel. The court then granted the State's request for a mistrial without prejudice based upon defense counsel's discovery violation.

Defense counsel objected for the record. The prosecution indicated that it would be filing a motion to have defense counsel removed from the case. Defendant subsequently filed a motion to dismiss the charge against him on the grounds of double jeopardy. The trial court held a hearing on the motion, during which both parties essentially reiterated the arguments they had previously made in support of and against the trial court declaring a mistrial. The trial court denied defendant's motion, stating that defense counsel's discovery violation had "handcuffed" the prosecution's examination of Dr. Spitz and that the problems created by the violation could not be cured by dismissing either defense counsel or Dr. Spitz from the case.

Defendant contends that the trial court erred by denying his motion to dismiss the charges against him based upon double jeopardy. Defendant does not dispute that the failure to tender the letter to the prosecution constituted a discovery violation. Rather, he claims that there was not a manifest necessity for declaring the mistrial because there were other, less drastic, alternatives available to the trial court.

The double jeopardy clauses of the United States and Illinois Constitutions protect a criminal defendant from repeated prosecutions for the same offense. U.S. Const., amend. V; Ill. Const. 1970, art. I, §10. The constitutional protection against double jeopardy attaches after the jury is selected and sworn. *People ex rel. Roberts v. Orenic*, 88 Ill. 2d 502, 507 (1981). Since jeopardy attaches before the judgment becomes final, the constitutional protection embraces a defendant's

right to complete his trial before a particular tribunal. *Arizona v. Washington*, 434 U.S. 497, 503, 54 L. Ed. 2d 717, 727, 98 S. Ct. 824, 829 (1978). Therefore, where a court declares a mistrial without the defendant's consent, the court necessarily deprives the defendant of his valued right to have a particular jury decide his fate. *People v. Bagley*, 338 Ill. App. 3d 978, 981 (2003). However, the declaration of a mistrial does not necessarily preclude a second trial of the defendant because a defendant's right to have his trial completed by a particular jury "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 93 L. Ed. 974, 978, 69 S. Ct. 834, 837 (1949); *Arizona*, 434 U.S. at 505, 54 L. Ed. 2d at 728, 98 S. Ct. at 830. Where, as in this case, the trial court declares a mistrial without the defendant's consent, the State should be allowed to retry the defendant if it can demonstrate that the mistrial was warranted by "manifest necessity." *Arizona*, 434 U.S. at 505, 54 L. Ed. 2d at 728, 98 S. Ct. at 830; *People v. Burtron*, 376 Ill. App. 3d 856, 862 (2007).

■■ ■ The Supreme Court has interpreted manifest necessity to mean a "high degree" of necessity. *Arizona*, 434 U.S. at 506, 54 L. Ed. 2d at 729, 98 S. Ct. at 831. The doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's right to have a particular tribunal decide his fate until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by continuing the proceedings. *United States v. Jorn*, 400 U.S. 470, 485-86, 27 L. Ed. 2d 543, 557, 91 S. Ct. 547, 557 (1971); *People v. Ortiz*, 151 Ill. 2d 1, 13 (1992). "Essentially, in determining whether manifest necessity exists, the trial court must balance the defendant's interest in having the trial completed in a single proceeding, reserving the possibility of obtaining an acquittal before that 'particular tribunal,' against the strength of the justification for declaring a mistrial rather than attempting to continue the trial to a verdict." *People v. Street*, 316 Ill. App. 3d 205, 211 (2000), citing 5 J. Israel, N. King & W. LaFave, Criminal Procedure §25.2(c), at 654 (2d ed. 1999). A number of factors may be considered when making a "manifest necessity" determination, including:

"(1) the source of the difficulty that led to the mistrial—i.e., whether the difficulty was the product of the actions of the prosecutor, defense counsel, or trial judge, or were events over which the participants lacked control; (2) whether the difficulty could have been intentionally created or manipulated for the purpose of giving the prosecution an opportunity to strengthen its case; (3) whether the possible prejudice or other legal complications created by the difficulty could be 'cured' by some alternative action that would

preserve the fairness of the trial; (4) whether the record indicates that the trial judge considered such alternatives; (5) whether any conviction resulting from the trial would inevitably be subject to reversal on appeal; (6) whether the trial judge acted during the 'heat of the trial confrontation'; (7) whether the trial judge's determination rests on an evaluation of the demeanor of the participants, the 'atmosphere' of the trial, or any other factors that similarly are not amenable to strict appellate review; (8) whether the trial judge granted the mistrial solely for the purpose of protecting the defendant against possible prejudice; (9) whether the evidence presented by the prosecution prior to the mistrial suggested a weakness in the prosecution's case (e.g., a witness had failed to testify as anticipated); (10) whether the jurors had heard enough of the case to formulate some tentative opinions; (11) whether the case had proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence; and (12) whether the composition of the jury was unusual." 5 J. Israel, N. King & W. LaFave, Criminal Procedure §25.2(c), at 654 n.18 (2d ed. 1999).

See also *Street*, 316 Ill. App. 3d at 211-13 (discussing and applying the above factors); *People v. LaFond*, 343 Ill. App. 3d 981, 985 (2003) (discussing and applying four of the factors).

Notwithstanding these factors, the determination of whether manifest necessity warrants a mistrial is based on the facts of each case and is left to the sound discretion of the trial court. *LaFond*, 343 Ill. App. 3d at 985-86. As the Supreme Court has explained, the manifest necessity standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial. The broad discretion reserved to the trial judge in such circumstances has been consistently reiterated in decisions of this Court." *Illinois v. Somerville*, 410 U.S. 458, 462, 35 L. Ed. 2d 425, 429, 93 S. Ct. 1066, 1069 (1972). Our supreme court has similarly stated that declaring a mistrial is a "drastic course of action [that] should be taken only ' "[w]here, for reasons deemed compelling by the trial judge, *who is best situated intelligently to make such a decision*, the ends of substantial justice cannot be attained without discontinuing the trial." ' " (Emphasis added.) *People v. Segoviano*, 189 Ill. 2d 228, 241 (2000), quoting *People v. Chaffin*, 49 Ill. 2d 356, 362 (1971), quoting *Gori v. United States*, 367 U.S. 364, 368, 6 L. Ed. 2d 901, 904, 81 S. Ct. 1523, 1526 (1961). The *Segoviano* court further explained the deferential standard of review as follows:

"The trial court's evaluation of whether this threshold has been reached is reviewed only for abuse of discretion [citations], and

must be afforded the 'highest degree of respect,' as the trial court 'is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.' " *Segoviano*, 189 Ill. 2d at 241, quoting *Arizona*, 434 U.S. at 511, 514, 54 L. Ed. 2d at 732, 733, 98 S. Ct. at 833, 834, quoting *Wade*, 336 U.S. at 689, 93 L. Ed. at 978, 69 S. Ct. at 837.

We also review the trial court's denial of defendant's motion to dismiss the charges against him on double jeopardy grounds under an abuse of discretion standard. *People v. Hill*, 353 Ill. App. 3d 961, 965 (2004).

■ In this case, based upon our review of the record, we cannot say that the trial court abused its discretion by declaring a mistrial over defendant's objection. Initially, the discovery violation which led to the mistrial was entirely within the control of and caused by defense counsel. As the trial court found and as defense counsel herself acknowledged, the rules of discovery required defense counsel to tender to the prosecution counsel's letter to Dr. Spitz. Defendant's trial began on June 20, 2006, and therefore defense counsel could have tendered her letter to Dr. Spitz, dated January 31, 2005, well before the start of trial. Further, although it was the prosecution that ultimately requested the mistrial, the evidence presented during the State's case-in-chief was strong and contained no obvious weaknesses which could have motivated the State to seek a mistrial. The unimpeached eyewitness testimony presented by the State established that defendant and the victim engaged in an argument inside defendant's apartment and that defendant followed the victim outside and then choked her to death. Likewise, the defense had called only one witness before the incident giving rise to the mistrial, defendant's brother, whose testimony was not particularly material and did not detract from the State's case in any meaningful way. Thus, it cannot be said that the prosecution sought a mistrial after having obtained a substantial preview of the defense's tactics and evidence. Given these circumstances, the present case does not involve a situation where " ' "bad-faith conduct by [the] judge or prosecutor," [citation] threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. [Citation.]' " *Lee v. United States*, 432 U.S. 23, 33, 53 L. Ed. 2d 80, 89, 97 S. Ct. 2141, 2147 (1977), quoting *United States v. Dinitz*, 424 U.S. 600, 611, 47 L. Ed. 2d 267, 276, 96 S. Ct. 1075, 1081 (1976).

Moreover, the record shows that the trial court did not act in the "heat of the trial confrontation" when it declared the mistrial. In this respect, we note that an order declaring a mistrial cannot be condoned where the trial court acted irrationally and irresponsibly, and that

whether the court gave counsel an opportunity to be heard regarding a mistrial and the amount of time devoted to the mistrial decision are " 'of major importance.' " *Burtron*, 376 Ill. App. 3d at 863, quoting *People v. Dahlberg*, 355 Ill. App. 3d 308, 314-15 (2005). This is so because "[a] hasty decision, reflected by a rapid sequence of events culminating in a declaration of a mistrial, tends to indicate insufficient concern for the defendant's constitutional rights." *Dahlberg*, 355 Ill. App. 3d at 315.

For example, in *Dahlberg*, a case upon which defendant relies, the appellate court held that the trial court's declaration of a mistrial was not a manifest necessity. *Dahlberg*, 355 Ill. App. 3d at 316-17. In reversing the trial court's order of a mistrial, the court noted that the trial judge declared a mistrial because she was angry that defense counsel had not filed a motion *in limine* to address counsel's line of questioning during the victim's cross-examination, and that the trial judge acted without permitting the defendant to complete an offer of proof regarding the line of questioning. The trial judge also cut defense counsel off when he attempted to explain his line of questioning, did not give counsel an opportunity to explain his position on the propriety of a mistrial, and did not consider any alternatives at the time the mistrial was declared. *Dahlberg*, 355 Ill. App. 3d at 316; see also *Jorn*, 400 U.S. at 487, 27 L. Ed. 2d at 557-58, 91 S. Ct. at 558 (determining that the trial judge acted so abruptly in discharging the jury that there was no opportunity for the defendant to object to the mistrial).

On the other hand, in *Arizona*, the Supreme Court determined that the trial judge did not act precipitately in response to the prosecutor's request for a mistrial after defense counsel aired improper and highly prejudicial evidence before the jury. *Arizona*, 434 U.S. at 514-15, 54 L. Ed. 2d at 734, 98 S. Ct. at 835. Rather, the trial court evinced a concern for the possible double jeopardy consequences of an erroneous ruling by allowing both defense counsel and the prosecutor a full opportunity to explain their positions on the propriety of a mistrial. *Arizona*, 434 U.S. at 515-16, 54 L. Ed. 2d at 734, 98 S. Ct. at 835. Such action on the part of the trial judge indicated that he acted "responsibly and deliberately, and accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." *Arizona*, 434 U.S. at 516, 54 L. Ed. 2d at 734, 98 S. Ct. at 835.

Similarly, in *Burtron*, the court found that the trial court did not abuse its discretion when it declared a mistrial after defense counsel engaged in a pattern of conduct which resulted in numerous sidebars and admonitions from the trial judge about counsel's conduct and which culminated when defense counsel stated, in the presence of the

jury, that the defendant would be willing to submit to a polygraph exam by the State Police. *Burtron*, 376 Ill. App. 3d at 858-59, 866. In distinguishing the case from those in which the trial court made a hasty decision to declare a mistrial, the court noted that "a cognizance of defense counsel's many indiscretions and their potential impact on the jury contributed to the judge's ultimate decision to declare a mistrial, a decision that might well have been carefully weighed, as a potential necessity if matters grew worse, for a number of hours prior to defense counsel's outburst about the polygraph." *Burtron*, 376 Ill. App. 3d at 865. In upholding the trial court's declaration of a mistrial, the court also noted that the mistrial was declared late in the proceedings, after the judge had ample time to assess the demeanor and motivations of the parties involved, and that the judge had stated for the record the reasons he did not believe a proposed curative instruction to the jury would have cured the prejudice that had been injected into the proceedings. *Burtron*, 376 Ill. App. 3d at 865-66.

In this case, as in *Arizona* and *Burtron*, the record shows that the trial court gave both defense counsel and the prosecution a significant amount of time to explain their positions on the propriety of a mistrial and accorded careful consideration to defendant's interest in having his trial completed by a particular tribunal. The *in-camera* discussion between the attorneys and the court regarding the discovery violation and its possible remedies spans almost 40 pages of the report of proceedings. During that time, contrary to defendant's argument, the trial court did not appear angry at defense counsel for failing to tender the letter but, rather, demonstrated patience and a willingness to consider counsel's explanation for the discovery violation and reasons as to why a mistrial was inappropriate. During these discussions, the trial court also carefully considered numerous suggested alternatives to declaring a mistrial and stated for the record the court's reasons for finding that each would not have cured the problems created by defense counsel's discovery violation.

Defendant nevertheless claims that there were alternatives to declaring a mistrial that the trial court failed to properly consider and that would have cured any prejudice to the prosecution from the discovery violation while preserving the fairness of the trial. Defendant asserts that these alternatives included a continuance, questioning Dr. Spitz to determine whether the facts related in defense counsel's letter were material to his ultimate opinion, or allowing Dr. Spitz to testify while precluding any reference to the disputed facts contained in counsel's letter. We disagree.

The trial court in this case declared a mistrial based upon defense counsel's discovery violation. When a party fails to comply with a

discovery rule or order, it is within the trial court's discretion to "order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." *People v. Turner*, 367 Ill. App. 3d 490, 499 (2006); 134 Ill. 2d R. 415(g)(i). The preferred sanction for a discovery violation that is not "blatant" is a recess or a continuance if the granting thereof would be effective to protect the other party from surprise or prejudice. *People v. Pondexter*, 214 Ill. App. 3d 79, 85 (1991). The exclusion of evidence is not a preferred sanction because it does not further the goal of truth seeking. *Bagley*, 338 Ill. App. 3d at 982. The sanction of precluding a witness from testifying "is reserved for only the most extreme cases," " 'where the uncooperative party demonstrates a "deliberate contumacious or unwarranted disregard of the court's authority." [Citations.].' " *Taylor v. Illinois*, 484 U.S. 400, 417 n.23, 98 L. Ed. 2d 798, 816 n.23, 108 S. Ct. 646, 657 n.23 (1988), quoting *People v. Rayford*, 43 Ill. App. 3d 283, 286-87 (1976).

In the present case, despite the significance of defense counsel's letter to Dr. Spitz, the prosecution did not obtain it until after it had rested its case and while Dr. Spitz was on the witness stand testifying on defendant's behalf. In that letter, defense counsel indicated that she had interviewed a "witness" who observed the struggle between the victim and defendant. According to that witness, the victim repeatedly hit defendant with an object believed to be her purse and with her hand, and defendant appeared to be holding his hands up in a defensive posture but was not seen striking the victim. As the trial court pointed out, the information related in counsel's letter regarding the victim hitting the defendant was quoted almost directly in the conclusion section of the doctor's written report, which was prepared only three weeks after counsel's letter was sent to the doctor, and Dr. Spitz ultimately concluded that the victim died, in part, from stress and agitation associated with this altercation. When questioned by the trial court, defense counsel initially indicated that the witness referred to in the letter was Cheryl Fields and that she had later determined that Fields was not a credible witness and had communicated that to Dr. Spitz. However, there is no indication in defense counsel's letter to Dr. Spitz that she found Fields to be incredible. Defense counsel later told the court that the same information had been related to her by defendant during statements that he made that were not reduced to writing. As the prosecution pointed out, however, counsel's letter referred only to a "witness" and did not mention defendant.

It was under these circumstances that the trial court was placed in the difficult position of determining the appropriate remedy for

defense counsel's discovery violation. In this respect, we find the circumstances confronted by the trial court in this case similar to those faced by the court in *Bagley*. In that case, after the jury was sworn but before the first witness was called, the State located a videotape of defendant's arrest that was believed to be lost. *Bagley*, 338 Ill. App. 3d at 978-79. Defense counsel informed the court that he would need additional time to prepare if the tape were admitted and asked the court to exclude the tape, noting that viewing it at that time threw "a total wrench in the works" for the defense. *Bagley*, 338 Ill. App. 3d at 980. The trial court declared a mistrial, stating that production of the tape at that time was an unfair surprise and that because the tape was available and otherwise admissible, exclusion of the tape would have been an overly harsh sanction. *Bagley*, 338 Ill. App. 3d at 980. On appeal, the court found that the trial court did not abuse its discretion by declaring a mistrial. The court noted that the State did not act in bad faith by failing to previously produce the tape and that excluding the tape would therefore have been a harsh sanction that would not have furthered the truth-seeking process. *Bagley*, 338 Ill. App. 3d at 982. Referencing defense counsel's statements to the trial court after the tape was produced, the court also concluded that the tape would have significantly affected defense counsel's strategy and time to prepare for trial and that a short continuance would therefore not have protected defendant from surprise or prejudice. *Bagley*, 338 Ill. App. 3d at 982-83. The court ultimately concluded that the trial court's decision to declare a mistrial struck a proper balance between defendant's right to have his trial completed by a particular tribunal and the public's interest in fair trials designed to end in just judgments. *Bagley*, 338 Ill. App. 3d at 983.

In this case, as in *Bagley*, the trial court could have reasonably concluded that the most appropriate remedy for the discovery violation was to declare a mistrial. On one hand, precluding Dr. Spitz from testifying was not a viable solution. The trial court considered this alternative but found that it would almost certainly lead to defendant being found guilty and would likely result in reversible error. We agree with the trial court's assessment. Defendant's case appears to have been based almost entirely upon Dr. Spitz's proposed opinion that the victim died not from strangulation but, rather, from a combination of factors including cocaine and alcohol ingestion, preexisting hypertensive cardiovascular disease, obesity, and excitement, stress and agitation associated with her altercation with defendant. Dr. Spitz's conclusion that the victim did not die of strangulation was also based, in part, on the lack of evidence upon autopsy of injury to the victim's jaw and neck. This proposed testimony stood in contrast to Dr. Jones'

testimony that the victim died of strangulation and that, in most cases where a "choke hold" was used to bring about the victim's death, there are usually no signs of injury on the outside of the victim's body. Thus, Dr. Spitz's proposed testimony was critical to defendant's case and, when considered along with the overwhelming evidence of defendant's guilt, striking Dr. Spitz as a witness would not have furthered the truth-seeking process and would have risked a guilty verdict that could have been reversed on appeal. See *People v. Lovinger*, 130 Ill. App. 3d 105, 112 (1985) (noting that, as a general matter, "a trial judge properly exercises his discretion to declare a mistrial if *** a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial"); *People v. Flores*, 168 Ill. App. 3d 284, 293 (1988) (trial court abused its discretion by excluding the testimony of the defendant's medical expert as a sanction for a discovery violation).

On the other hand, a short continuance would not have protected the prosecution from surprise and prejudice. Given the nature of the discovery violation, discussed in more detail above, and defense counsel's statements regarding the source of the information contained in the letter, the prosecution would have required additional time in order to prepare for its cross-examination of Dr. Spitz and to possibly locate and speak with Fields, the source of the information contained in counsel's letter. Moreover, Dr. Spitz was not a lay witness but, rather, an expert witness testifying as to the victim's cause of death. Just as Dr. Spitz's expert testimony was central to defendant's case, it was also critical for the prosecution to be able to effectively cross-examine the doctor in order to challenge his opinion. Under these circumstances, the trial court could have reasonably concluded that a continuance of a few days would not have given the prosecution adequate time to prepare and that, at a minimum, a continuance of more than a few days would have been required. Such a continuance would not have been a viable solution given that this case was being tried before a jury and that the continuance would have taken place during the middle of trial after the prosecution had presented its case.

Defendant nevertheless argues that Dr. Spitz could have been questioned as to whether he relied upon the information contained in counsel's letter. At oral arguments in this case, defense counsel acknowledged that the trial court would have been within its discretion to declare a mistrial had Dr. Spitz testified that he relied upon the information contained in defense counsel's letter in formulating his opinion. Defendant suggests, however, that had Dr. Spitz testified that he did not rely upon that information, the inquiry would have ended and counsel's error essentially would have been harmless. We disagree.

The prosecution would have been surprised and prejudiced had Dr. Spitz testified that he did not rely upon the information in counsel's letter. Such testimony would have been contrary to the doctor's written report, which the prosecution relied upon to prepare its cross-examination of Dr. Spitz and which indicates that the doctor did in fact rely upon that information. The surprise and prejudice to the prosecution would have been made greater by the fact that this reformulation of the doctor's opinion would have taken place in the middle of a jury trial after the prosecution had presented its case. Moreover, questioning the doctor about the letter would have interjected a new witness into the trial, Cheryl Fields, whom the prosecution may have sought to call as a witness. Such questioning would have also interjected defense counsel as a potential witness in the case because it was counsel who provided the information to Dr. Spitz. As the trial court noted, this could have required that counsel be removed as defendant's attorney given that the prosecution indicated it would seek to call counsel as a witness.[1]

Defendant also argues that Dr. Spitz could have been asked to express his opinion based upon factors other than the information contained in counsel's letter. However, we do not believe Dr. Spitz should have been allowed to fashion his opinion around a set of hypothetical circumstances that were clearly different than the facts the doctor relied upon to formulate his written report. Such a remedy does not further the truth-seeking process. Additionally, as discussed above, any reformulation of the doctor's opinion in the middle of a jury trial would have put the prosecution in a difficult situation and required a continuance of at least more than a few days in order to prevent surprise and prejudice to the prosecution.

Defendant finally argues that it was unreasonable for the prosecution to take the position that cross-examination about the altercation between defendant and the victim was essential to its case because, at the time counsel's letter was discovered by the prosecution, the information contained in that letter regarding the altercation had already been testified to by the State's witness, Rachael Schram. However, Schram's testimony regarding the dispute between defendant and the victim differed significantly from counsel's description of the altercation in the letter sent to Dr. Spitz. Schram testified that the victim and defendant were arguing and physically struggling while inside the apartment, that defendant was pushing the victim while she attempted to leave the apartment, and that, once outside, the

---

[1]Defendant does not contend that removal of counsel would have been a viable alternative to a mistrial. Therefore, we need not consider this issue.

victim swung her purse once at defendant. This version of the altercation stood in contrast to counsel's statements in her letter to Dr. Spitz that the victim "repeatedly" hit defendant with an object believed to be her purse and with her hands, and that defendant appeared to be holding his hands up in a defensive position and was not seen "inflicting any blows" upon the victim. Thus, it cannot be said that Schram testified to the same information regarding the altercation that was related in counsel's letter to Dr. Spitz. Moreover, the central issue regarding the discovery violation was what information Dr. Spitz relied upon in formulating his written expert opinion. Given the differences between these versions of the altercation and the fact that the doctor's written report indicates that the altercation with defendant played a significant part in the victim's death, we cannot say that Dr. Spitz's opinion would have remained the same had he not considered the information related in counsel's letter. Moreover, we do not believe the trial court should have stopped the case in the middle of trial in order for Dr. Spitz to review Schram's testimony and subsequently be questioned as to what effect it might have had upon his expert opinion.

Ultimately, the record demonstrates that the trial court took great care to balance defendant's rights to a fair trial and to have his fate decided by a particular tribunal in a single proceeding against the resulting prejudice to the State from defense counsel's discovery violation and the public's interest in a fair trial ending in a just result. The court also gave significant consideration to numerous factors relevant to a determination as to whether a mistrial was appropriate and ultimately concluded that the only solution that would protect the parties' competing interests was to declare a mistrial. While defendant points to alternatives he claims could have cured the State's objections, we cannot say that any of these alternatives were clearly more viable than the remedy chosen by the trial court. Under these circumstances, we believe it is appropriate to afford the trial court's decision to declare a mistrial the deference to which it is entitled. As has been noted, when considering whether the trial court abused its discretion by declaring a mistrial, "[a] reviewing court [does not] consider whether it would have made the same decision if placed in the position of the trial court; rather, [a reviewing court] consider[s] whether the decision of the trial court was arbitrary, made without conscientious judgment, or otherwise made in such a way that, ' "in view of all of the circumstances, the [trial] court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." ' " *Burtron*, 376 Ill. App. 3d at 863, quoting *People v. Largent*, 337 Ill. App. 3d 835, 839-40 (2003), quoting *Bodine Electric of Champaign v. City of Champaign*, 305 Ill. App. 3d 431, 435 (1999).

Given the facts of this case, we cannot say that the trial court's determination to declare a mistrial constituted an abuse of discretion. Therefore, because principles of double jeopardy do not bar the retrial of defendant, the trial court also did not abuse its discretion by denying defendant's motion to dismiss the charges against him.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

O'MALLEY, P.J., and CAHILL, J., concur.