SHAWN LYNN GLOVER, JR., Petitioner, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK, AND THE HONORABLE DAVID WALL, District Judge, Respondents, AND THE STATE OF NEVADA, Real Party in Interest.

No. 51941

November 12, 2009 220 P.3d 684

[Rehearing denied February 17, 2010]

Hardesty, C.J., with whom Saitta, J., agreed, dissented in part. Cherry, J., dissented.

*Philip J. Kohn*, Public Defender, and *Danny A. Silverstein*, Deputy Public Defender, Clark County, for Petitioner.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, and *Steven S. Owens*, Chief Deputy District Attorney, Clark County, for Real Party in Interest.

## OPINION

By the Court, PICKERING, J.:

This petition for a writ of prohibition asks us to decide whether the district court violated petitioner Shawn Glover's double jeopardy rights when it granted a mistrial and ordered him to stand trial a second time on murder and lesser related charges. The district court determined that defense counsel had irretrievably biased the jury by putting before them facts not in evidence, making mistrial a "manifest necessity."

The controversy arose out of a voluntary statement Glover gave the police. The State told the defense that it did not intend to use Glover's statement at trial. The district court ruled that, when offered by the defense, the statement was inadmissible hearsay. Despite this ruling, defense counsel repeatedly put the statement before the jury, first in his opening statement, when he displayed excerpts of Glover's police statement on PowerPoint; then during cross-examination of the detective who interrogated Glover, whom defense counsel asked to show the jury an envelope, neither marked nor admitted in evidence, and confirm that it contained a videotape of Glover's interrogation; and again in closing argument. Although the State's objections were sustained, the jury could not help but get the point that the defense thought Glover's excluded statement was crucial and unfairly forbidden them.

Matters came to a head in closing argument when, despite earlier orders in limine, the defense exhorted the members of the jury to ask themselves why the State would not let them see or hear what Glover said to the police. The court rebuked defense counsel and directed him to discontinue this line of argument. He continued with it anyway, even after the court ordered him to stop, telling the jurors that the State kept Glover's police statement from them because it "is devastating to their case, absolutely devastating." It was at this point that the court called a recess, asked for input on the options available, including possible curative instructions, and ultimately, declared a mistrial.

We uphold the district court's orders excluding Glover's statement and prohibiting argument about its content. Significantly, the defense admits that Glover's out-of-court statement was hearsay. While the State could have offered the statement as the admission of a party opponent, no legitimate negative inference arose from the State's decision not to offer this otherwise inadmissible evidence. The State's failure to use the statement just meant the State had invoked the hearsay rule, which deems a defendant's exculpatory out-of-court statements self-serving and thus inadmissible.

We also reject Glover's double jeopardy challenge. *Arizona v. Washington*, 434 U.S. 497, 514 (1978), frames the question before us, which is not whether other reasonable judges might have assessed the risk of juror bias differently and proceeded with the trial, but whether the judge who presided over this trial abused his discretion in making the determination he did. *Id.* at 511. Here, as in *Washington*, the defense brought the mistrial order upon itself by arguing facts not in evidence and violating the court's orders in limine, and now seeks to benefit from the mistrial order its rule violations produced. The district judge saw firsthand the impact the defense's improper argument had on the jurors. It related directly to the key contested issue of self-defense. The number of times the excluded evidence was put before the jurors and the drama that played out before them over its exclusion led the district court to conclude that the risk of jury bias and the public's interest in having an impartial jury decide this case outweighed Glover's right to have the case conclude before the jury first sworn to hear it. On this record, we cannot say that the district judge did not exercise ''sound discretion''—that is to say, that he acted ''irrationally or irresponsibly''—in declaring that mistrial was a ''manifest necessity.'' *Id.* at 514. Accordingly, we deny the petition and dissolve our temporary stay of Glover's retrial.

## *FACTS*

The core issue in this case was self-defense. Six eyewitnesses saw Glover shoot Derek Moore in broad daylight in Glover's front yard. By all accounts Moore started the fight. Uninvited, Moore drove his SUV onto Glover's property, got out, and threatened Glover's younger brother, Byron, whom Moore accused of having burglarized Moore's girlfriend's house. By the time Glover shot him, though, Moore and the two people who accompanied him to the Glovers' house had gotten back into the SUV. Also undermining self-defense, Glover had time to go into his house and back outside to Moore's vehicle (whether to get the gun he used to shoot Moore or to yell for his mother to call the police is disputed) before he shot Moore at near point-blank range.

Moore and his companions drove to a neighboring grocery store parking lot. His companions called 911 but Moore's gunshot wound was mortal, and he died before emergency services arrived. Police took gunshot residue samples from Moore. Because they did not find a gun in Moore's SUV or on his person, they did not run gunshot residue tests on the samples.

Police were also dispatched to the Glover home. Glover and Byron had fled to their grandmother's house. Later that day, Glover's mother called and asked the police to come back. Glover had returned home from his grandmother's by then. He surrendered himself and his gun to the police. The police took Glover into custody and transported him to the station, where Glover gave the police the voluntary videotaped statement that underlies this writ proceeding.

## PROCEEDINGS IN THE TRIAL COURT

At trial, Glover admitted killing Moore but asserted self-defense made the homicide justifiable. Before the defense gave its opening statement, the parties reviewed outside the presence of the jury the PowerPoint slides the defense planned to use in its opening statement. The prosecution warned that it did not plan to introduce Glover's statement to the police into evidence and that it objected on hearsay grounds to the defense using the statement. Nonetheless, during its opening statement, the defense put up a PowerPoint screen that showed the jury transcribed quotes from Glover's police statement. The court sustained the prosecution's objections to the defense's displaying this inadmissible evidence.[1]

---

[1]The trial transcript includes the following:

[DEFENSE COUNSEL]: When he [Glover] arrived at his grandma's house, he was crying, and he says, Grandma, what do I do, and he tells his grandma precisely what happened, and his grandma says you need to call the police, and he does just that. He turns himself in that night. He didn't contact defense counsel. He didn't talk to anyone that could give him legal advice. But rather he goes in and sits down with the police now, and the police read him his Miranda rights and say tell me what happened.

And he gives a police statement, and these are some of the quotes he says in the statement to the police that very night. He said, quote, a dude and some other big dude, really big—

[PROSECUTOR]: Judge, I object. Can we approach?

THE COURT: Sure.

(Thereupon a brief discussion was held at the bench.)

[DEFENSE COUNSEL]: And you will learn that ultimately my client spoke to the police, and he talked about his fears that night. He talked about precisely what he saw happen. He talked about the confrontation.

[PROSECUTOR]: Judge, I apologize for the objection, but I'm going to make the same objection.

THE COURT: The objection is sustained.

Glover's police statement came up next in connection with Jesus Prieto's testimony. Prieto was the detective who responded to the 911 call and later took Glover's statement. Reviewing the following day's witnesses outside the jury's presence, the State said it doubted it would call Prieto and that, if it did, it did not plan to ask him about Glover's statement. When the defense said it would call Prieto if the State didn't, the court confirmed its earlier ruling that, if offered by Glover, his police statement was inadmissible hearsay. After hearing argument, the court clarified that the defense could establish through Prieto (or Glover) that Glover turned himself in and argue that this supported self-defense. However, the court reiterated "you still can't go into the statement." Defense counsel affirmed that he "agreed" he could not get into the "contents of [Glover's] statement, even indirectly."

The State ended up calling Detective Prieto but on matters other than Glover's station house interview. The court granted the defense's request to exceed the scope of direct examination. At several points in Prieto's cross-examination, the prosecution renewed its "objection as to hearsay as to anything that occurred in the interview room" and added a relevancy objection. Although these objections were sustained, defense counsel asked Prieto to identify for the jury a sealed envelope as containing a videotape of Glover's statement. The envelope was neither opened nor marked as an exhibit, and neither side moved to admit the statement or the videotape then or at any other time during trial.[2]

Glover testified in his own defense, giving the jury a detailed account of his encounter with Moore. He related how scared he was for himself and his family, the death threats he heard Moore make, the Uzi he saw tattooed on Moore's hand, Moore's menacing statements that he was "burnered" and would "wet the place down," and his belief, based on those statements, that Moore had a gun and was about to shoot when he shot Moore. Glover also testified that he panicked and went to his grandmother's after the shooting, returning home only after he spoke to his mother on the phone. Although Glover testified that he turned himself in to the police, he was neither asked nor said anything about the statement he gave them at the station.

Trial took just three days. The defense's closing argument drew repeated objections and sidebars on matters unrelated to this writ proceeding. Things erupted when the defense told the jury it should consider why the State had not shared Glover's police statement with them:

---

[2]Glover's statement to the police was not offered or admitted in evidence in audiotape or transcript form either and is not part of the record before this court.

[DEFENSE COUNSEL]: I want you to think about something in this case. Shawn Glover gave a statement to the police. He sat down with Detective Prieto and gave a statement. It was recorded on video. You saw the videotape in the envelope. Detective Prieto brought it in. It was right here in this courtroom. The Government didn't play it for you.

Think about that. Why? They've got a statement from the suspect in a murder case hours after the shooting. They didn't play it for you. Why? That video would have shown you not just what Shawn said—

[PROSECUTOR]: *Judge, objection. He is talking about evidence that's not in evidence.*

THE COURT: *Sustained.*

[DEFENSE COUNSEL]: Well, Your Honor, I just want to say that the video would have shown—

THE COURT: *I sustained the objection. Move on, please.*

(Emphases added.) Defying the court's order to move on, defense counsel continued to argue the excluded evidence:

DEFENSE COUNSEL: The Government didn't show you that video. Why? You think if the video of Shawn Glover hours after the shooting captured what he looked like? Do you think if that helped the Government's case even a little bit that you would have seen it? *Why didn't they play that video for you? Because it is devastating to their case, absolutely devastating.*

(Emphasis added.) At this point, the court excused the jury and called for argument on mistrial.

The prosecution argued that the court should grant a mistrial because defense counsel had violated the court's orders in limine and gone out-of-bounds to assert personal knowledge of facts not in evidence on the key, contested issue of self-defense. In the State's view, it is fundamentally unfair and bias-producing to hold one side to the rules of evidence and trial conduct and not the other. The defense countered that the objected-to statements were a legitimate request for the jury to draw a negative or adverse inference from the State's failure to introduce evidence only it could introduce.

The court allowed both members of the defense team to argue separately. Accepting arguendo that the lawyer who presented the closing argument had crossed the line, his co-counsel advocated a proposed curative instruction that would have told the jury not to consider Glover's videotaped statement because it was not admitted in evidence (true) and defense counsel had not seen it and did not know what it said (false). Of note, nobody suggested, not even the defense, that the prejudice could be cured by the standard instruction

already given at the outset of the trial and included in the proposed final jury instructions to the effect that what the lawyers say is not evidence.

The court heard counsel out to the point "we're [all] just repeating ourselves." After a recess to review the applicable law, the court delivered its findings. It found that the defense had gone beyond arguing inference to "argue facts not in evidence which from time [im]memorial has been a prohibition in either opening or closing," and had attacked "the credibility of the particular individuals trying the case for the state." The court noted that its rulings had been clear, and clearly disobeyed, even after an express order to stop and move on to something else. The court then focused on the draft curative instruction and explained that, in its view, the instruction was not honest or believable: "I cannot in good conscience instruct the jury . . . to make such a fantastic leap of logic that you don't know what's on [the videotape] when you've already—(A) it's your own client's statement, and (B) you told them it's devastating, absolutely devastating." Most troubling of all, whatever limiting instruction it might fashion, the district court found that the jury could not be expected to disregard defense counsel's statements to them about the videotape, "especially since you paraded it[3] in front of them the other day"—not to mention that he did so presumably with the jury's full attention, openly defying a direct court order from the judge to move on. Acknowledging the controlling constitutional standard, the court concluded, "I don't feel that in my discretion I have much choice but to determine that the ends of justice and manifest necessity dictate the declaration of a mistrial . . . I cannot resolve the issue any other way."

Thereafter, Glover moved to dismiss the charges against him based on double jeopardy. The motion was denied, and this petition for a writ of prohibition followed. This court stayed Glover's retrial pending decision on his petition.

## DISCUSSION

A writ of prohibition will issue to interdict retrial in violation of a defendant's constitutional right not to be put in jeopardy twice for the same offense. *Hylton v. District Court*, 103 Nev. 418, 421, 743 P.2d 622, 624 (1987) (citing U.S. Const. amend. V; Nev. Const. art. 1, § 8). Jeopardy attaches when a jury is sworn, but the constitutional guarantee against double jeopardy "does not mean that

---

[3]Whether "it" refers to the PowerPoint display of the question and answer between Prieto and Glover or to the envelope containing the videotape Prieto halfway identified is unclear.

every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment." *Wade v. Hunter*, 336 U.S. 684, 688 (1949). On the contrary, since 1824 it has been settled law that a criminal trial may be discontinued before verdict and a defendant retried without violating double jeopardy if, in the "exercise [of] a sound discretion" and "taking all the circumstances into consideration," the trial court determines that "the ends of public justice" make mistrial a "manifest necessity." *United States v. Perez*, 22 U.S. 579, 580 (1824); *accord Ex Parte Maxwell*, 11 Nev. 428, 435, 436 (1876) (expressing the rule in terms of "sound legal discretion" and an "overruling necessity").

In criminal trials, "the public as well as the accused have interests that should be safeguarded and protected." *Merritt v. District Court*, 67 Nev. 604, 607, 222 P.2d 410, 411 (1950). The public's interest lies in seeing that "[v]erdicts in [criminal] causes [are] the result of honest deliberation by individuals who are of a mind free from bias and prejudice." *Id.* A deadlocked jury is the classic example of the "manifest necessity" for mistrial before final verdict that will permit retrial without offense to a defendant's double jeopardy rights. *Logan v. United States*, 144 U.S. 263 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510 (1968). Though less common, improper advocacy that places prejudicial and inadmissible evidence before the jury can create an unacceptable risk of biased jury deliberations and also require mistrial as a matter of "manifest necessity." *Arizona v. Washington*, 434 U.S. 497, 514, 516 (1978); *Hylton*, 103 Nev. at 426, 743 P.2d at 628.

For a defense lawyer to make statements to the jury that are not and cannot " 'be supported by proof is, if it relates to significant elements of the case, professional misconduct . . . and fundamentally unfair.' " *Washington*, 434 U.S. at 513 n.32 (quoting *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring)). Such misconduct "unquestionably tends to frustrate the public interest in having a just judgment reached by an impartial tribunal[ ] [and] create[s] a risk, . . . not present in the individual juror bias situation that the entire panel may be tainted." *Id.* at 512. The trial court has an array of measures available to deal with improper argument by counsel. This includes, in an appropriate case, the power to declare a mistrial:

> The trial judge, of course, may instruct the jury to disregard the improper comment. In extreme cases, he may discipline coun-

sel, or even remove him from the trial . . . . Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument. Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases.

*Id.* at 512-13; *see Hylton*, 103 Nev. at 426, 743 P.2d at 628 (noting that it is important to consider "the need to hold litigants on both sides to standards of responsible professional conduct in the clash of an adversary criminal process" and that "[i]f the act of a defendant aborts a trial, he or she should not be allowed to erect a constitutional shelter based on double jeopardy by frustrating the trial").

"A judicial determination of manifest necessity is reviewed for abuse of discretion, but the level of deference varies according to the circumstances in each case." *United States v. Chapman*, 524 F.3d 1073, 1082 (9th Cir. 2008). "[G]reat deference" is due "a trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument" on the jury. *Washington*, 434 U.S. at 514. There are "compelling institutional considerations" for this deference. The trial judge

has seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more conversant with the factors relevant to the [mistrial] determination than any reviewing court can possibly be.

*Id.* at 513-14 (quotation omitted). The trial judge must exercise a "sound discretion" and cannot act "irrationally or irresponsibly" in granting a mistrial over the objection of the defense. *Id.* at 514. But "along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny," improper advocacy concerning inadmissible evidence "falls in an area where the trial judge's determination" of potential juror bias and the need for a mistrial "is entitled to special respect." *Id.* at 510.

*The argument was improper*

Applying these standards here, the first question we must decide is whether the district court correctly ruled defense counsel's argument out-of-bounds. If the district court's evidentiary rulings were wrong, the mistrial determination changes dramatically. *See Benson*

*v. State*, 111 Nev. 692, 695, 895 P.2d 1323, 1326 (1995) (noting that the argument by defense counsel that led the district court to declare a mistrial and hold counsel in contempt was later deemed unobjectionable by this court, making it necessary to determine whether the defendant consented to the mistrial; without the defendant's consent, double jeopardy barred retrial). We review a district court's evidentiary rulings, *Harkins v. State*, 122 Nev. 974, 980, 143 P.3d 706, 709 (2006), and its rulings respecting the latitude allowed counsel in closing argument, *Herring v. New York*, 422 U.S. 853, 862 (1975), for abuse of discretion.

### *Glover's statement was hearsay*

The State did not offer Glover's unsworn, out-of-court statement to the police into evidence as it could have under NRS 51.035(3). When offered by Glover, the statement was inadmissible hearsay unless some other basis for its admission was adduced, but none was. Implicit in Glover's negative-inference argument was that the jury should accept his unadmitted out-of-court statement as a species of prior consistent statement—that the jurors should infer that the State did not show them the tape because Glover's statement to the police supported his trial testimony that he acted in self-defense. However, the State didn't impeach Glover with a prior inconsistent statement or accuse him of "recent fabrication or improper influence or motive," NRS 51.035(2)(b), which is required for a prior consistent statement to come in. This left Glover's police statement inadmissible.

Nevada's evidence code, like the Federal Rules of Evidence, does not "accord . . . weighty, nonhearsay status to all prior consistent statements." *Tome v. United States*, 513 U.S. 150, 157 (1995) (construing Fed. R. Evid. 801(d)(1)(B), a cognate to NRS 51.035(2)(b)). A party who takes the stand and testifies in support of his cause cannot bolster his in-court testimony with consistent but self-serving prior out-of-court statements. *United States v. Bao*, 189 F.3d 860, 864-65 (9th Cir. 1999). This is so even though parts of his prior out-of-court statement are statements against penal interest. *Id.*; *see United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (stating "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts [which are hearsay]" (quotation omitted) (alterations in original)); *United States v. Chard*, 115 F.3d 631, 634-35 (8th Cir. 1997). As the Supreme Court stated in *Williamson v. United States*, 512 U.S. 594, 600 (1994), "[s]elf-exculpatory state-

ments are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.''

### Negative inference and facts not in evidence

Even though inadmissible if offered by him, Glover maintains he was entitled to argue a negative or adverse inference from the State's failure to offer his out-of-court statement into evidence. Because of the State's burden of proving guilt beyond a reasonable doubt, ''defense attorneys must be permitted to argue all reasonable inferences from the facts in the record[; t]his includes the 'negative inferences' that may arise when a party fails to call an important witness at trial, or fails to produce relevant documents or other evidence, and it is shown that the party has some special ability to produce such witness or other evidence.'' *United States v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992). Also fundamental, however, is the legal and ethical rule that ''counsel may not premise arguments on evidence which has not been admitted.'' *Johnson v. United States*, 347 F.2d 803, 805 (D.C. Cir. 1965). The prohibition against arguing facts not in evidence applies to the prosecution and the defense alike. ''[I]t is improper for either the prosecutor or defense counsel to 'ma[ke] statements as to facts not proven' or to put his or her 'personal knowledge and belief . . . on the scales.' '' *Hoffman*, 964 F.2d at 24 (quoting *United States v. Latimer*, 511 F.2d 498, 503 (10th Cir. 1975) (second alteration in original)).

In closing argument, Glover argued without objection that the jury should draw a negative inference from the State's failure to conduct gunshot residue tests on samples taken from Moore's hands and clothes to determine whether Moore had a gun and/or the range at which he was shot. In Glover's view, his negative-inference argument about the State's failure to admit his videotaped police statement is no different from his gunshot-residue argument. But Glover is wrong, for two reasons.

First, in drawing the jury's attention to the lack of gunshot residue test results, defense counsel confined his argument to asking the jury to consider whether a gunshot residue test would have been helpful, such that the absence of such test results amounted to reasonable doubt. He did not argue, as he did with respect to Glover's videotaped out-of-court statement, that the test results existed but had been suppressed and that they supported Glover. It is one thing to

argue "fair inferences from the record" and quite another to argue "the existence of facts *not* in the record." *Hoffman*, 964 F.2d at 25 (emphasis in original). While "a defendant is entitled to argue to the jury that the government's failure to present a particular type of strong evidence against her—e.g., fingerprints [or gunshot residue test results]—weakens its case . . . [she is not entitled] to use the lack of [such] fingerprint [or other] evidence as 'a springboard for arguing facts not in evidence.'" *United States v. Thompson*, 37 F.3d 450, 454 (9th Cir. 1994) (quoting *Hoffman*, 964 F.2d at 26). The latter form of negative-inference argument violates the "fundamental rules" against going "outside the record [to make] statements as to facts not proven" and "put[ting] the personal knowledge and belief of the prosecuting [or defense] attorney on the scales, which is also clearly improper." *Latimer*, 511 F.2d at 503.

Second, the inference Glover asked the jury to draw from the State's failure to introduce his police statement into evidence was illegitimate. The hearsay rules declare prior out-of-court statements untrustworthy and inadmissible when offered to bolster a declarant's own in-court testimony, absent exceptions concededly not applicable here. *See United States v. Check*, 582 F.2d 668, 677 n.27 (2d Cir. 1978) (noting the "well-recognized principle that, generally speaking, a witness's prior consistent statements are inadmissible because '[i]f [the witness's testimony in court] is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of it'" (quoting 4 J. Wigmore, *Evidence* § 1124, at 255 (Chadbourn rev. 1972) (alterations in original))). Just as a party may not argue a negative inference based on a claim of privilege, NRS 49.395, it is improper to argue a negative inference based on a proper hearsay objection. *Cf. Grosjean v. Imperial Palace*, 125 Nev. 349, 357, 212 P.3d 1068, 1074 (2009) (noting in its recitation of trial counsel's misconduct that "an objection is not evidence upon which [a lawyer] could comment").

*Johnson v. United States*, 347 F.2d 803 (D.C. Cir. 1965), and *Reichert v. United States*, 359 F.2d 278 (D.C. Cir. 1966), illustrate the point. Both were Jencks Act cases, 18 U.S.C. § 3500, in which the government made a show in front of the jury of handing over to the defense written witness statements after they testified. The jury thus learned of the statements' existence and could also see that, while the defense had the statements, it did not use them for impeachment or as evidence. In closing, the government argued that the jury should infer from the defense's failure to use them that the statements corroborated the government's witnesses, confirming the weakness of the defense's case. This was deemed improper, requiring reversal and retrial:

It is a well known rule of evidence, applicable in criminal and civil cases alike, that prior consistent statements may not be used to support one's own unimpeached witness. . . . No one would seriously argue that the Government could formally introduce Jencks Act statements in support of its own unimpeached witness. Yet the comments of the prosecuting attorney in this case accomplish virtually the same result in the minds of the jurors. Based as they are on inadmissible evidence, such comments are not permissible.

*Johnson*, 347 F.2d at 805-06 (footnotes omitted).

The defense's closing argument in this case was equally improper. If Glover's videotaped statement to the police had probative value other than the inadmissible hearsay it contained, the defense did not identify or argue it. Nonetheless, defense counsel argued affirmatively to the jury that the videotaped statement would have shown what Glover said and that its contents were "devastating . . . absolutely devastating" to the State's case. "Vigorous, even zealous argument is one thing . . . [b]ut the clear intimation of the argument was that [counsel] knew personally that the 'statements' were damaging and tended to corroborate [his] witness[ ]." *Reichert*, 359 F.2d at 281-82. As in *Reichert* and *Johnson*, "there was no evidence to such effect, indeed the statements themselves had not been received," and the jury was thus invited to accept counsel "as an unsworn witness" attesting to what was on the videotape. *Reichert*, 359 F.2d at 282.[4]

The rules prohibiting a lawyer from going beyond legitimate negative-inference argument to improperly address facts not in evi-

---

[4]Other courts have similarly disallowed negative-inference argument that crosses over into arguing facts not in evidence. *Jean-Marie v. State*, 993 So. 2d 1160 (Fla. Dist. Ct. App. 2008) (upholding trial court's refusal to allow argument by defense that the prosecution's failure to call as a witness the detective who investigated the crime and took a statement from defendant permitted an inference that the detective's testimony would have favored the defendant, where there was no explanation of how the testimony of the detective, who did not witness the crime, could have elucidated any relevant issue); *State v. Lankford*, 565 S.W.2d 737 (Mo. Ct. App. 1978). With the advent of modern discovery and the abrogation of the rule prohibiting impeachment of a witness the party calls, the legitimacy of negative-inference argument has diminished. *See* 2 *McCormick on Evidence* § 264 (6th ed. 2006). To avoid problems with putting inadmissible evidence before the jury, some courts commend counsel, before making such an argument, to make an offer of proof so that the trial court can "limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter that might prejudice its deliberations." *State v. McArthur*, 899 A.2d 691, 702 (Conn. App. Ct. 2006) (citations and quotations omitted).

dence or matters of counsel's personal opinion are not confined to the prosecution in criminal cases, as the dissent suggests. Because prosecutors cannot comment on a defendant's failure to testify or shift the burden of proof to the defense, the prosecution has less latitude in arguing negative inferences than the defense. *Cf. Whitney v. State*, 112 Nev. 499, 502, 915 P.2d 881, 883 (1996). Nonetheless, in laying down rules of trial conduct to govern counsel in closing argument, the American Bar Association Standing Committee on Standards for Criminal Justice "quite properly hold[s] all advocates to essentially the same standards." *United States v. Young*, 470 U.S. 1, 9-10 (1985) (citing the comment to *ABA Standards for Criminal Justice*, Standard 4-7.8 (renumbered 4-7.7 in 1993), that "[i]t should be accepted that both prosecutor and defense counsel are subject to the same general limitations in the scope of their argument"). "Defense counsel is no more entitled than the prosecutor to assert as fact that which has not been introduced in evidence. The rules of evidence cannot be subverted by putting to the jury, in argument or opening statements, matters not in the record." *ABA Standards for Criminal Justice*, Standard 4-7.7 cmt. (3d ed. 1993).

> There are often circumstances in which defense counsel may be entitled to argue to the jury that they should draw an inference adverse to the prosecution as the result of its failure to bring forth some particular item of evidence or to call as a witness someone who has a special relation to the facts of the case. But it is ordinarily a form of misrepresentation, and therefore *improper, for counsel to argue such an inference when counsel knows that the evidence was not presented because it had been excluded by the court or is inadmissible.*

*Id.* (emphasis added).

Equally with the prosecution, "Defense counsel should not intentionally refer to or argue on the basis of facts outside the record." *ABA Standards for Criminal Justice*, Standard 4-7.8 (1993); doing so "can involve the risk of serious prejudice, with a mistrial as a possible remedy." *Id.* at cmt. That risk was realized here.

*Manifest necessity and the ends of justice*

Upholding the district court's determination that defense counsel improperly argued facts not in evidence does not resolve this case. We still must determine whether, given the improper argument, retrying Glover will violate Glover's right under the Double Jeopardy Clauses of the United States and Nevada Constitutions, which mandate that no person shall "be subject . . . to be twice put in jeopardy" for the same offense. U.S. Const. amend. V; Nev. Const. art. 1, § 8.

Where a criminal trial ends in acquittal or conviction, the constitutional guarantee against double jeopardy "automatically bar[s] retrial] (unless, of course, the conviction is later reversed)." *Carter v. State*, 102 Nev. 164, 168, 717 P.2d 1111, 1113 (1986). "[W]hen a criminal proceeding is terminated without finally resolving the merits of the charges against the accused," by contrast, "retrial is not automatically barred." *Arizona v. Washington*, 434 U.S. 497, 505 (1978). If a case ends "after jeopardy attaches but before the jury reaches a verdict, a defendant may be tried again for the same crime . . . in two circumstances: (1) if he consents to the [mistrial]; or (2) if the district court determines that the [mistrial] was required by 'manifest necessity.'" *United States v. Chapman*, 524 F.3d 1073, 1081 (9th Cir. 2008) (internal quotation omitted). Given that this case did not end in a judgment of acquittal or conviction and that Glover objected to the mistrial, only the latter, "manifest necessity" exception is implicated here.

While our cases recite that we review a district court's "manifest necessity" mistrial determination for an "abuse of discretion," *Beck v. District Court*, 113 Nev. 624, 627, 939 P.2d 1059, 1060 (1997); *see Rudin v. State*, 120 Nev. 121, 143, 86 P.3d 572, 586 (2004), "the level of deference varies according to the circumstances in each case." *Chapman*, 524 F.3d at 1082. Where the prosecutor " 'is responsible for the circumstances which necessitated declaration of a mistrial,' " *Beck*, 113 Nev. at 627, 939 P.2d at 1060 (quoting *Hylton*, 103 Nev. at 423, 743 P.2d at 625), or guilty of "inexcusable negligence," *Hylton*, 103 Nev. at 426, 743 P.2d at 627, "strictest scrutiny" applies, because "the Double Jeopardy Clause . . . protect[s] a defendant against governmental actions intended to provoke mistrial requests . . . [or] bad faith conduct . . . [that] threatens the [h]arassment of an accused." *Washington*, 434 U.S. at 508 (quotations omitted) (last alteration in original). At the other end of the spectrum are cases where the defense caused the mistrial and "the judge's [mistrial] determination is based on his or her own observations and personal assessment that a fair trial would be impossible" because of "jury bias." *Chapman*, 524 F.3d at 1082. In such cases, the reviewing court will give " 'special respect' to [the trial] judge's determination of manifest necessity . . . based on jury bias." *Id.* (quoting *Washington*, 434 U.S. at 510).

There is no mechanical rule by which to calculate "manifest necessity." *See United States v. Jorn*, 400 U.S. 470, 480 (1971) (noting that "a mechanical rule prohibiting retrial whenever circum-

stances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide"). A reviewing court's goal is to ensure that "the trial judge exercised 'sound discretion' in declaring a mistrial." *Washington*, 434 U.S. at 514. " 'Sound discretion' exists where the trial judge acts 'responsibly and deliberately' rather than 'irrationally or irresponsibly.' " *Klein v. Leis*, 548 F.3d 425, 431 (6th Cir. 2008) (quoting *Washington*, 434 U.S. at 514, 516). Because appellate review is designed to "weed out irrational or irresponsible behavior by the trial judge," other reviewing courts have "focus[ed] on the procedures employed by the judge in reaching his determination," in addition to considering which side caused the mistrial and whether the determination involved juror prejudice. *Chapman*, 524 F.3d at 1082 (quotations omitted). Among the procedural factors considered are "whether the district court (1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chose the alternative least harmful to a defendant's rights, (3) acted deliberately instead of abruptly [and/or (4)] based [the mistrial] on evidence presented in the record." *Id.* (quotations omitted). *See also* 5 J. Israel, N. King & W. LaFave, *Criminal Procedure* § 25.2(c) (2d ed. 1999), *cited and discussed in People v. Edwards*, 902 N.E.2d 1230, 1238 (Ill. App. Ct. 2009) (discussing these and a number of other factors that can weigh in the manifest necessity determination).

*"Manifest necessity" in cases involving improper defense argument and jury bias*

First among the factors to consider in the "manifest necessity" calculus is "the source of the difficulty that led to the mistrial—i.e., whether the difficulty was the product of the actions of the prosecutor, defense counsel or trial judge, or were events over which the participants lacked control." 5 J. Israel, N. King & W. LaFave, *supra*, § 25.2(c), at 654. Here, the defense, not the prosecution, caused the mistrial. The prosecution gave the defense advance warning it objected to Glover's statement being used, and the State did not seek a mistrial, despite the defense's repeated violations of the court's order excluding Glover's statement, until the court called a recess during the closing argument and called for argument on mistrial. Further, the district court based its mistrial decision on its determination that the jury's impartiality had been unacceptably compromised. The district court's "manifest necessity" determination thus deserves the highest level of deference. *See Chapman*, 524 F.3d at 1082.

The lead Supreme Court case addressing "manifest necessity" for a mistrial produced by defense counsel's improper argument is *Arizona v. Washington.*[5] In *Washington*, defense counsel gave an opening statement in which he told the jury the defendant was being retried because the state had "suppressed and hidden" evidence at the first trial. 434 U.S. at 499. The Arizona state trial court judge determined this statement could not be proven by admissible evidence, that it carried the risk of impermissibly tainting the jury, and declared a mistrial on these bases. *Id.* at 510-11. The Ninth Circuit held this violated Washington's constitutional guarantee against double jeopardy. *State of Arizona v. Washington*, 546 F.2d 829 (1976).

The Supreme Court disagreed. It held that "the extent of the possible [juror] bias cannot be measured," that "some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions," and, thus, that "[i]n a strict, literal sense, the mistrial was not 'necessary.'" *Washington*, 434 U.S. at 511. "Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* "Neither party has a right to have his case decided by a jury which may be tainted by bias." *Id.* at 516. Where the trial judge determines that improper advocacy by the defense has created an unacceptable risk of tainting the jury, "the public's interest in fair trials designed to end in just judgments must prevail over the defendant's valued right to have his trial concluded before the first jury impaneled." *Id.* (quotation omitted).

Glover argues that the defense's transgressions in this case are minor compared to those in *Washington*. Perhaps. It is also reasonable to view the conduct in the two cases as functionally similar, since both involve accusations that the prosecution, in effect, hid evidence. Indeed, in terms of the risk of juror bias, this case is more serious given the number of times defense counsel put the inadmissible evidence before the jury, and given the fact the improper argument went to a core contested issue in the case (self-defense), in addition to discrediting the prosecution's tactics and strategy.

---

[5]In applying the "manifest necessity" standard, this court has not differentiated between the state and federal constitutional protection against double jeopardy, and the parties do not suggest a basis for doing so in this case. In *Carter*, 102 Nev. at 169, 717 P.2d 1114, we applied and followed the "manifest necessity" standards set down in *Washington*, 434 U.S. at 507, including, specifically, its recognition that manifest necessity does not mean absolute necessity but, rather, "a 'high degree' of necessity."

In this case, as in *Washington*, the defense first introduced the improper evidence in opening statement. Unlike *Washington*, no mistrial was declared or even sought at that point. Crediting the defense's good faith, the State simply objected to the argument and the PowerPoint slide and its objections were sustained. However, after this exchange and after the court again ruled Glover's statement inadmissible, defense counsel returned to the statement during Prieto's cross-examination, when he held the unmarked envelope up for Prieto to identify as containing a videotape of the excluded interview. These displays apparently had a visible effect on the jury, because the court made specific note of counsel having "paraded it around in front of them" in dismissing the likelihood that a curative instruction could dispel the prejudice. Finally, in closing argument, defense counsel argued the inadmissible evidence directly as "devastating," and persisted in doing so after the district court instructed him to stop. In *Washington*, by contrast, only one improper comment was made in opening, before the district court deemed it improper, and the defense did not openly defy the court in continuing to argue the point.[6]

[Headnote 37]

As *Washington* recognizes, the fact that the defendant or his counsel engaged in the misconduct that caused the mistrial does not necessarily trump the defendant's double jeopardy rights. However, it diminishes them considerably by increasing the level of deference accorded the district court's mistrial determination. *See* 4 J. Cook, *Constitutional Rights of the Accused* § 29:18 (3d ed. 2009) (stating as a general rule that, "[w]hen a mistrial is necessitated by the behavior of the accused, retrial will not be barred by the protection against double jeopardy [and that t]he same is true when the mistrial is occasioned by the actions of defense counsel"). To hold otherwise would give "unscrupulous defense counsel . . . an unfair advantage." *Washington*, 434 U.S. at 513. "[W]hen defense counsel employs tactics which would be reversible error if used by a prosecutor the result may be an unreviewable acquittal." *United States v. Young*, 470 U.S. 1, 9 n.6 (1985). To add to this incentive a rule readily allowing a double jeopardy challenge to bar retrial when a

---

[6]The dissent notes that the district court rejected the State's cumulative-misconduct argument as a basis for mistrial. But the district court's statement about not entertaining a cumulative error argument went to other unrelated comments the defense made in closing, to which objections had been separately sustained. The district court did not thereby suggest that it viewed the defense's improper use of Glover's out-of-court statement as isolated or minor. On the contrary, the fact the defense kept returning to the unadmitted videotaped statement figured in the district court's conclusion that the jury could not be expected to disregard the defense's comments about it.

district court grants a mistrial based on a defense attorney's intentional defiance of an order in limine is thus inappropriate. *Washington*, 434 U.S. at 513 (noting that "[t]he adoption of a stringent standard of appellate review in this area [of improper argument by defense counsel] . . . would seriously impede the trial judge in the proper performance of his 'duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop . . . professional misconduct'" (quoting *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (last alteration in original)). Unless the district judge acted "irrationally or irresponsibly" in granting the mistrial, therefore, Glover's double jeopardy challenge fails. *Washington*, 434 U.S. at 514.

Other courts, confronted with double jeopardy challenges to defense-produced mistrials, have similarly recognized that

> [t]he trial court has a duty to ensure that all parties have a fair trial and has the authority to grant a mistrial where injustice is caused to either party in a criminal case and is especially empowered to avoid the absurdity of a defendant benefitting from the prejudicial error he created.

*Pleas v. State*, 495 S.E.2d 4, 6 (Ga. 1998); *see Banks v. State*, 495 S.E.2d 877, 881 (Ga. Ct. App. 1998) (upholding mistrial based on defense counsel introducing evidence prohibited by the rape shield statute in violation of the court's pretrial order); *Porter v. Ferguson*, 324 S.E.2d 397, 401 (W. Va. 1984) (denying a defendant's writ of prohibition against retrial where the trial court granted a mistrial based on defense counsel twice violating an in limine order by asking a key prosecution witness if she had been arrested); *People v. Burtron*, 877 N.E.2d 87, 89, 94-95 (Ill. App. Ct. 2007) (upholding trial court's grant of a mistrial based on its assessment of the prejudice to the State as a result of defense counsel's argument that the defendant would be willing to take a polygraph; noting that the district court was not obligated to tolerate what he found was intentional misconduct by defense counsel); *Pavey v. State*, 764 N.E.2d 692, 701 (Ind. Ct. App. 2002) (upholding grant of mistrial based on defense counsel's improper characterization of State's plea agreement with a key prosecution witness to the jury; noting that where the defendant's counsel's conduct was "purposeful," the defendant is hard-pressed to "claim that he has been subjected to double jeopardy in new proceedings brought about by his intentional misconduct in the original proceedings" (citation omitted)); *State v. Levison*, 510 N.W.2d 495, 499 (Neb. Ct. App. 1993) (upholding the trial court's grant of a mistrial based on defense counsel's reference during opening to the state having previously dismissed the charges against the defendant). *See also Hylton*, 103 Nev. at 426, 743 P.2d

at 628 (noting that "[a]n important factor to be considered" in assessing a double jeopardy clause challenge based on improper argument "is the need to hold litigants on both sides to standards of responsible professional conduct in the clash of an adversary criminal process").

## No procedural indications of abuse of discretion

### Views of the counsel for the parties

Turning to the procedures the district court followed in declaring a mistrial, the record shows no factors suggesting an abuse of discretion. The district court solicited the opinions of the parties before declaring a mistrial, allowing both members of the defense team and the prosecution to be fully heard. Its solicitude extended not just to the mistrial determination but to the evidentiary rulings that preceded it.

### Alternatives to mistrial

The record further demonstrates that the district court understood and considered alternative remedies to mistrial. Glover suggested two: (1) reopening the trial to show the jury the videotape; and (2) instructing the jury that the defense had not seen the tape and did not know what Glover, their client, had said to the police. The former was unworkable. The trial had been conducted on the basis that the tape was not in evidence. The hearsay rule excluded it as untrustworthy; reopening the evidence to play the tape would have given it more impact than it would have had if it had been played during trial—and rewarded violation of the district court's evidentiary rulings. It also would have impacted the prosecution's strategy, since the State's case had been presented and argued on the assumption the tape was not coming into evidence.

The curative instruction the defense proposed was also unworkable. Telling the jury to disregard the tape and that the defense team did not know what was on it or what their client had said to the police would have required the district court to make an obvious misrepresentation to the jury. Further, as the district court found, such an instruction would have cast defense counsel in a poor light. If the jury believed the instruction, it would have cost the defense counsel's credibility, given his direct representations before the recess that the tape's contents were "devastating . . . absolutely devastating" to the State's case. It also would have cast defense counsel as incompetent in terms of his knowledge of his client's case. If the jury did not believe the instruction, it cast the court in a dishonest light.

The concurring and dissenting opinions fault the district court for not explaining on the record why a simple instruction to the jury to disregard defense counsel's improper argument would not have

cured the prejudice. At the beginning of the case the jury had been told that the lawyers' arguments are not evidence, and a similar instruction was included in the final settled set of instructions as instruction number 33. Notably, the defense tied its proposed curative instruction to instruction number 33 but did not argue that instruction 33, standing alone, was adequate to cure the prejudice. On this record, it appears the collective judgment of those involved—the prosecution, the defense, and the trial judge—was that a simple instruction to disregard the improper argument would not be effective. This conclusion seems fair, given the PowerPoint and videotape displays of the Glover statement, the number of times the issue came up, and the drama that surrounded its exclusion. While it would be helpful for the district court to make an express finding why an instruction to disregard defense counsel's comments would not have sufficed, the court's findings that the more complete curative instruction the defense offered was unworkable and that "I don't feel I have much choice . . . and cannot resolve the issue any other way" adequately explain its ruling. *See Washington*, 434 U.S. at 517 (distinguishing between findings that are desirable and those that are "constitutionally mandated"). These determinations are not ones this court is in a position to second-guess, given the district court's superior vantage point on the content, timing, and manner of delivery of the improper argument and the impact it had on the jury.

Other remedies have been suggested as generally available to a district court to control the conduct of the trial attorneys, including discipline, contempt, and the invited response doctrine. These first two remedies, as *Washington* makes clear, may be invoked any time a lawyer engages in misconduct in front of the court, but they do not cure the problem of a jury that has been unfairly biased by exposure to improper argument. 434 U.S. at 512-13. And while the "invited response" or "invited reply" rule, by which "the defense counsel argues improperly, provoking the prosecutor to respond in kind, and the trial judge takes no corrective action" has received grudging acceptance, *United States v. Young*, 470 U.S. 1, 11 (1985), this doctrine carries its own costs and is not an alternative a district judge should be second-guessed for failing to endorse. Dee R. Nidiry, *Restraining Adversarial Excess in Closing Argument*, 96 Colum. L. Rev. 1299, 1319-24 (1996).

### Deliberateness

Finally, the record belies Glover's claim that the district court acted precipitously in declaring a mistrial. The district court dealt with the improper argument in a measured manner, beginning with the defense's introduction in its opening statement of the PowerPoint

slide displaying evidence the defense knew was inadmissible and continuing thereafter. Not until the defense had violated the court's orders in limine and disobeyed a direct order to move on to another subject did the court broach mistrial. It treated counsel courteously in front of the jury and heard them out fully after excusing the jury, allowing counsel to make a record of their justification for the argument and the proposed alternatives to mistrial. The court identified and applied the appropriate constitutional standards. No procedural abuse occurred here that supports Glover's argument that an abuse of discretion occurred.

## CONCLUSION

The defense violated the district judge's orders excluding evidence and crossed the line that separates legitimate negative inference argument from impermissible statements about facts not in evidence and personal opinion. The resulting potential for juror bias created a "manifest necessity" for mistrial. Double jeopardy does not bar retrial in such a case. Accordingly, we deny the writ petition and vacate our prior order staying further proceedings in the district court.

PARRAGUIRRE, DOUGLAS, and GIBBONS, JJ., concur.

HARDESTY, C.J., with whom SAITTA, J., agrees, concurring in part and dissenting in part:

I concur with the majority with respect to the impropriety of defense counsel's closing argument. However, for two reasons, I dissent from the majority's conclusion that the circumstances at trial created a manifest necessity for a mistrial. First, the district court failed to make the type of findings that would entitle its ruling to the "special respect" granted by the majority. Second, the district court failed to consider a standard instruction to disregard the improper argument, an instruction that this court has repeatedly held cures the type of error that occurred in this case.

### Deference

The United States Supreme Court explained in *Arizona v. Washington*, 434 U.S. 497 (1978), that in the context of a mistrial granted over a defendant's objection, the level of deference to the district court's ruling will depend on the case. The strictest scrutiny is applied where the "prosecutor requests a mistrial in order to buttress weaknesses in his evidence." *Id.* at 507. On the other end of the spectrum, greater deference is granted where the trial judge believes that the jury is unable to reach a verdict. *Id.* at 509. Likewise, "a trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument is entitled to great deference." *Id.* at 514. In other words, when a district court's mistrial "determination is based on his or her own observations and personal

assessment that a fair trial would be impossible, that view must be given special deference.'' *U.S. v. Chapman*, 524 F.3d 1073, 1082 (9th Cir. 2008). This is mainly because the trial judge ''is far more conversant with the factors relevant to the determination than any reviewing court can possibly be.'' *Washington*, 434 U.S. at 514 (internal quotations omitted). The majority concludes that the district court's ruling in this case is entitled to special deference. I disagree.

This court has repeatedly advised that in order for a district court's ruling to receive deference on appeal, the district court must make its findings explicit on the record. *See, e.g., Knipes v. State*, 124 Nev. 927, 931-32, 192 P.3d 1178, 1181 (2008); *State v. Ruscetta*, 123 Nev. 299, 304, 163 P.3d 451, 455 (2007); *State v. Rincon*, 122 Nev. 1170, 1176-77, 147 P.3d 233, 237-38 (2006). It is equally well established that this court's review does not extend beyond the record. *Jacobs v. State*, 91 Nev. 155, 158, 532 P.2d 1034, 1036 (1975); *Anderson v. State*, 81 Nev. 477, 482, 406 P.2d 532, 534 (1965). Noticeably absent from the record in this case is any statement by the district court that its ruling was based on its ''own observations'' or ''personal assessment that a fair trial would be impossible.'' The district court pronounced its ruling based on its determinations that (1) the case was close, (2) defense counsel's argument was improper, and (3) the curative instruction proposed by the defense—that the jury was not to infer that defense counsel had seen the videotape—was inadequate because it required the jury to make a ''fantastic leap of logic.'' At no point did the district court state that its ruling was based on its observations of the demeanor or reactions of the jurors, the atmosphere or feeling in the courtroom, or any other fact that was not otherwise apparent from the cold record.

The majority infers that defense counsel's actions must have ''had a visible effect on the jury.'' The district court, however, made no statements to that effect. At no point did the district court make a finding that the jury visibly reacted to defense counsel's conduct. Nor was that point argued by the State. For this court to simply assume that such evidence existed goes beyond ''special respect'' and renders this court's review meaningless. It is not the function of this court to simply presume that there was a sufficient factual basis for a district court's ruling; that basis must be stated on the record. Where, as here, it is not, the district court's ruling is not entitled to special deference.

*Curative instruction*

In addition to the reasoning set forth above, I dissent because in my view the district court failed to consider the most reasonable solution: instructing the jury to disregard defense counsel's improper argument.

A mistrial is not dictated by manifest necessity where the district court failed to consider or apply a less drastic alternative. *See Johnson v. Karnes*, 198 F.3d 589, 596 (6th Cir. 1999) ("We further find it significant that the trial court judge failed to consider less drastic alternatives, but instead immediately decided that a mistrial was appropriate."); *Harpster v. State of Ohio*, 128 F.3d 322, 330 (6th Cir. 1997) (concluding that there is no manifest necessity for a mistrial where curative instruction would have protected against juror bias); *Brady v. Samaha*, 667 F.2d 224, 230 (1st Cir. 1981) (concluding that the trial judge erred in failing to "consider any alternatives to a mistrial, such as severance or curative instructions"); *Dunkerley v. Hogan*, 579 F.2d 141, 147-48 (2d Cir. 1978) (concluding that while the trial judge did not act "impetuously," the fact that there was at least one alternative to the mistrial meant that it was not dictated by manifest necessity); *Jones v. Com.*, 400 N.E.2d 242, 251 (Mass. 1980) ("Appellate deference will be accorded the trial judge's discretionary determination that 'manifest necessity' exists only if the record reflects that the trial judge gave reasoned consideration to the various available alternatives . . . before declaring a mistrial."); *State v. Bertrand*, 587 A.2d 1219, 1226 (N.H. 1991) (directing the lower courts to "exhaust alternatives" before declaring a mistrial).

During argument on the motion for mistrial, defense counsel proposed a curative instruction stating that "you are to infer that no one has seen the videotape or that defense counsel has no personal knowledge of the videotape." The district court declined the instruction, stating:

> I do not think that limiting instruction cures the issue. I cannot in good conscience instruct the jury that no one knows what's on it when it is in fact a statement of your client. I can't ask them to make such a fantastic leap of logic that you don't know what's on it when you've already—(A) it's your own client's statement and (B) you told them it's devastating, absolutely devastating.

The district court may have had good reason to reject this particular instruction. Unfortunately, however, the district court never considered the possibility of fashioning another instruction, or of simply instructing the jury to disregard defense counsel's comment. In addressing this issue, the majority concludes that "[o]n this record, it appears the collective judgment of those involved—the prosecution, the defense, and the trial judge—was that a simple instruction to disregard the improper argument would not be effective." But there is nothing in the record to support that conclusion.[1] And therein lies

---

[1] The majority confuses the standard instruction that counsel's arguments are not evidence with the curative instruction to disregard improper argument. These instructions serve very different purposes: while the former admonishes the jury not to give evidentiary weight to counsel's argument, the latter ad-

the problem: the absence of any finding by the trial judge forces the majority to arrive at a conclusion based on pure speculation.

This court has stated countless times that we presume that juries will follow jury instructions. *See, e.g., Summers v. State*, 122 Nev. 1326, 1333, 148 P.3d 778, 783 (2006); *Allred v. State*, 120 Nev. 410, 415, 92 P.3d 1246, 1250 (2004), *limited on other grounds by Knipes v. State*, 124 Nev. 927, 935, 192 P.3d 1178, 1183-84 (2008); *Leonard v. State*, 117 Nev. 53, 66, 17 P.3d 397, 405 (2001) (citing *Weeks v. Angelone*, 528 U.S. 225 (2000)). Furthermore, our caselaw is replete with instances where we have relied on this very principle and declined to find that improper statements by the prosecution constituted reversible error because the district court instructed the jury to disregard them. *See, e.g., Valdez v. State*, 124 Nev. 1172, 1192, 196 P.3d 465, 478 (2008) ("Although the comment was improper, we conclude that there was no prejudice because the district court sustained [the defendant's] objection and instructed the jury to disregard the comment."); *Pantano v. State*, 122 Nev. 782, 793, 138 P.3d 477, 484 (2006) (improper statements by prosecutor were harmless beyond a reasonable doubt because "the district court sustained the defense's objection and instructed the jury to disregard the statements, which supplied [the defendant] with an adequate remedy"); *Greene v. State*, 113 Nev. 157, 170, 931 P.2d 54, 62 (1997) (although prosecutor's statement was "patently improper," there was no prejudice because district court sustained the objection and admonished the jury), *overruled on other grounds by Byford v. State*, 116 Nev. 215, 235, 994 P.2d 700, 713 (2000); *Silva v. State*, 113 Nev. 1365, 1375, 951 P.2d 591, 597 (1997) ("'[E]ven when the objectional inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error.'" (quoting *Namet v. United States*, 373 U.S. 179, 187 (1963))). *See also Miller v. State*, 121 Nev. 92, 99, 110 P.3d 53, 58 (2005) ("[I]nstruct[ing] the jury to disregard improper statements, thus remed[ies] any potential for prejudice."); *Butler v. State*, 120 Nev. 879, 907, 102 P.3d 71, 90 (2004) (GIBBONS, J., concurring in part and dissenting in part) (same).

Here, not only did the district court fail to instruct the jury to disregard defense counsel's statement, but it failed to even *consider* such an instruction. The district court's failure to consider this simple measure leads me to conclude that the district court did not "exercise[ ] 'sound discretion' in declaring a mistrial." *Washington*, 434 U.S. at 514. Furthermore, the fact that there was "at least one alternative to a mistrial" meant that it was not dictated by manifest ne-

---

monishes the jury that an improper argument must be disregarded altogether. The fact that the evidentiary instruction was given in this case does not support the majority's conclusion that the trial judge and the parties had determined that an instruction to disregard the improper argument would not effectively cure the error.

cessity. *Dunkerley*, 579 F.2d at 148. "[I]t would be an unreasonable application of the law, as established by Supreme Court precedent, to conclude that manifest necessity existed for a mistrial in this case . . . [because] a simple corrective instruction would have sufficiently protected against juror bias." *Harpster*, 128 F.3d at 330. By holding that there was a manifest necessity for a mistrial in this case, the majority essentially holds that instructions to disregard effectively cure improper argument by the prosecution, but fail to do so when the error is made by the defense. I cannot accept that reasoning.

For these two reasons—the district court did not make the type of findings that would entitle its ruling to special deference and it failed to consider a simple curative instruction to disregard—I cannot conclude, as the majority does, that the district court's decision to grant a mistrial was dictated by manifest necessity. Therefore, I would grant the petition.

CHERRY, J., dissenting:

I respectfully dissent because I disagree with the majority's conclusions that defense counsel acted improperly and that there was a manifest necessity for a mistrial. I therefore would grant the petition.

### The negative inference

The majority concludes, without citation to authority, that it is improper to argue a negative inference from the assertion of a proper hearsay objection. To the contrary, it is my view that this case presents the exact situation for which the negative inference is intended.

A videotaped interview of a defendant shortly after a shooting is the type of evidence that one normally expects to be presented at a criminal trial. In addition to the State's burden of proving the defendant's guilt beyond a reasonable doubt, *see, e.g.*, *Cordova v. State*, 116 Nev. 664, 666, 6 P.3d 481, 483 (2000), the State has a duty to ensure that justice is done, not just to obtain a conviction. *See Campbell v. United States*, 365 U.S. 85, 96 (1961); *Berger v. United States*, 295 U.S. 78, 88 (1935). Accordingly, the Ninth Circuit Court of Appeals has explained that "a defendant is entitled to argue to the jury that the government's failure to present a particular type of strong evidence . . . weakens its case." *U.S. v. Thompson*, 37 F.3d 450, 454 (9th Cir. 1994). And historically, "the propriety of such an inference in general is not doubted." 2 John Henry Wigmore, *Wigmore on Evidence* 192 (Chadbourn ed. 1970).

Here, it is clear from opening statements that the defense expected the State to present the videotape to the jury. Indeed, the record reflects that both the defense and the prosecution expected a redacted version of Glover's statement to be presented. It was not until the morning of trial that the defense was informed otherwise. Because of

the evidentiary rules, the defense was unable to admit the videotape. However, the State could have offered it as the admission of a party opponent. *See* NRS 51.035(3)(a). Therefore, the evidence was "peculiarly within [the] power [of the State] to produce." *Graves v. United States*, 150 U.S. 118, 121 (1893); *see also State v. Smith*, 706 P.2d 1052, 1057-58 (Utah 1985) (quoting *Chicago Col. of Ost. Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983)). When the State failed to produce the videotape, it naturally created a presumption that the evidence was unfavorable. *See Graves*, 150 U.S. at 121.

In this case, the district court recognized that such inferences are proper and permitted negative inferences to be argued based on the State's cancellation of a gunshot residue test and apparent unwillingness to examine one of the key witnesses to the shooting. There was no compelling reason for the district court to preclude the same inference with respect to the videotape. The videotape was the type of evidence that would be natural for the State to produce, the State could have presented it, and the State chose not to do so. In my view, the fact that the defense was precluded from introducing the videotape has no bearing on the propriety of the negative inference. Therefore, I must disagree with the majority that defense counsel acted improperly in raising a negative inference based on the State's failure to present the videotape.

The majority's reliance on *Johnson v. United States*, 347 F.2d 803 (D.C. Cir. 1965), and *Reichert v. United States*, 359 F.2d 278 (D.C. Cir. 1966), is misplaced for at least three reasons.

First, in both cases the prosecution referenced the defendant's failure to use the applicable evidence for impeachment or other purposes. Clearly, the prosecutors' comments in those cases would be impermissible in Nevada because a defendant has no burden in a criminal case. Accordingly, this court has stated that comments on the failure to present evidence are not available to the State because they impermissibly shift the burden of proof to the defense. *Browning v. State*, 120 Nev. 347, 360, 91 P.3d 39, 49 (2004). For that reason alone, *Reichert* and *Johnson* are inapposite.

Second, the prosecutors in those two cases went beyond merely inferring that the unadmitted statements would corroborate their witnesses' testimony. In *Johnson*, the prosecutor explicitly stated, "They corroborate the testimony of the police officer from the witness stand." *Johnson*, 347 F.2d at 805. Likewise, in *Reichert*, the prosecutor stated,

> Did you see counsel impeach any of the Government witnesses with any of their earlier statements? Now ladies and gentlemen of the jury, we submit to you that the descriptions, the report, the facts in this case are unimpeached. Do you recall counsel impeaching the descriptions of either one of these two robbers?

*Reichert*, 359 F.2d at 281. While the statement in *Reichert* was not as direct as that in *Johnson*, it clearly inferred that the statements corroborated the in-court testimony. Furthermore, the prejudice in *Reichert* was heightened because the district court instructed the jury that it could consider the prior statements to the police, even though they had not been admitted as evidence. *Coleman v. United States*, 515 A.2d 439, 451 n.11 (D.C. 1986).

Less than two years after *Reichert* was decided, the court that had decided both *Johnson* and *Reichert* distinguished those cases in *Gibson v. United States*, 403 F.2d 569 (D.C. Cir. 1968). In that case, the prosecutor had referred to a prior unadmitted statement and the defendant's failure to use it for impeachment purposes. The court noted that the jury had previously been made aware of the statement and concluded that the error did not rise to the level of that in *Johnson* and *Reichert* because "[i]n both of those cases there was affirmative argument that the contents of the alleged statement corroborated the testimony of the witness." *Gibson*, 403 F.2d at 570 n.1. The present case is closer to *Gibson* than to either *Johnson* or *Reichert*. Defense counsel here commented on a prior statement of which the jury was already aware. Furthermore, defense counsel did not state that the videotaped interview would corroborate Glover's in-court testimony. He merely argued that the jury could infer that the State had chosen not to show the videotape because it would hurt the State's case. Accordingly, just as in *Gibson*, to the extent that counsel's comments were improper, "objection and correction by the District Judge" would have been sufficient. *Id.*

Third, neither *Johnson* nor *Reichert* involved a mistrial requested by the State. There were no double jeopardy concerns, nor did any court conclude that the prosecutors' comments in those cases created a manifest necessity for a mistrial. As will be discussed below, the simple fact that the court in *Gibson* concluded that a correctional instruction could rectify any prejudice made by reference to the prior out-of-court statement demonstrates that the situation here did not rise to a level justifying a mistrial.

The majority's references to the ABA Standards for Criminal Justice also miss the mark. Clearly, it would be unfair to raise a negative inference against a party for failing to present evidence when that party was precluded from presenting that evidence by the trial court. But that is not the case here. With respect to the State, the evidence was not excluded by the court as inadmissible; the *sole* reason the evidence was not presented was because the State *chose* not to present it. Therefore, I conclude that the inference was proper.

The majority concludes not only that defense counsel's inference in closing argument was improper, but describes defense counsel's actions as the culmination of repeated disobedience to district court rulings. In fact, the majority seems to suggest that this repeated misconduct places the facts of this case in the same category as those in

*Arizona v. Washington*, 434 U.S. 497 (1978), where defense counsel explicitly told the jury that they were participating in a second trial because the State had previously withheld evidence. Again, I must disagree.

The videotaped police interview first became an issue during opening statements when the prosecutor raised a hearsay objection to defense counsel's slideshow presentation that included quotations from Glover's recorded interview. The majority states that the prosecution warned defense counsel that it did not plan to introduce Glover's statement at trial. What the majority seems to ignore is the prosecution's concession that defense counsel had done nothing wrong because, the night before trial, counsel had met in chambers to discuss redacting part of the defendant's statement. Thus, as late as the eve of trial, both parties had contemplated the admission of Glover's videotaped interview.[1]

The next time the issue arose was during the testimony of Detective Jesus Prieto. Prior to defense counsel's cross-examination of Detective Prieto, defense counsel acknowledged that he could not get into Glover's comments in the interview but asserted that ''the fact that he showed up, the fact that he turned in the gun, the fact that he sat down with him, those things I believe are all admissible and all highly relevant as to whether or not this was self-defense.'' The district court stated, ''Well, we'll take it as it comes.'' Defense counsel followed the court's direction and did not ask Prieto about the substance of any of Glover's statements. No wrongdoing can be imputed to defense counsel for asking Prieto about the circumstances of the interview when the district court had, on the record, stated that it would rule on that issue ''as it comes.'' Moreover, evidence showing that a recorded interview took place was not hearsay; clearly, the only evidence precluded by a sustained hearsay objection is the specific out-of-court statements. To the extent that the majority implies that defense counsel violated the district court's evidentiary rulings by making the jury aware that a recorded interview took place, I cannot agree.

The videotaped interview was not mentioned again until closing argument, when defense counsel tried to raise a negative inference based on the State's failure to present the videotaped interview to the jury.[2]

Thus, after the first objectionable reference in opening statements (which the State acknowledge was justified), counsel made no ref-

---

[1]The record reflects that the defense attorney who prepared the PowerPoint presentation and presented Glover's opening statement was not informed until after the State's opening that the State would not be presenting the videotaped interview at trial.

[2]While the majority concludes that the inference was improper, the record reflects that the ''improper'' negative inference was not the basis for mistrial. In their briefs, the parties agree that a negative inference is proper. Rather, the

erence to Glover's statements in the interview. Accordingly, I cannot agree with the majority that the record exhibits repeated violation of the district court's evidentiary rulings.

During argument on the State's motion for mistrial, the State tried to expand its argument to include other instances of alleged improper behavior. The district court declined to expand the argument, stating, "I'm not seeing this as any cumulative problem. I'm isolating it to what was said here." A few moments later the court stated, "I would rather restrict [argument] to this particular comment." The majority asserts that "the fact the defense kept returning to the un-admitted statement figured in the district court's conclusion that the jury could not be expected to disregard the defense's comments about it." Based on the district court's comments, I cannot agree. The record reveals that the argument on the motion for mistrial was focused on defense counsel's choice of words and the impact of his comment on the minds of the jurors. During the lengthy argument on the merits of the State's motion for mistrial and the subsequent decision by the district court, the court did not make a single refer-ence to defense counsel having violated its evidentiary rulings prior to closing argument. When the district court pronounced its oral rul-ing, there was no mention of the prior objections that the majority describes as cumulating to warrant a mistrial. Rather, the district court's ruling was based entirely on its conclusion that nine words in Glover's closing argument—"[b]ecause it is devastating to their case, absolutely devastating"—went beyond an inference to argument of facts that were not in evidence.

I conclude that defense counsel raised a proper inference in clos-ing argument. Although defense counsel was overzealous in sug-gesting the answer to his own rhetorical question, he did not de-scribe the contents of the videotape, nor did he state that it conformed with his client's testimony at trial. Rather, defense coun-sel was raising a proper inference: that the State chose not to pres-ent evidence that it would normally produce because that evidence was harmful to the State's case. The only error, if any, was in going *beyond* the inference to suggest that the contents of the videotape it-self were "devastating to [the State's] case."

By condemning defense counsel's actions here and characterizing them as repeated disobedience to the district court's orders, I fear that the majority's ruling today will have a chilling effect on defense counsels' efforts to provide their clients with the effective represen-tation that is their constitutional right.

---

issue that was presented in the district court and that is argued here is whether defense counsel had gone *beyond* the scope of an inference and had told the jury what the videotape included and thus commented on facts that were not in evi-dence. Accordingly, rather than create a rule limiting a defendant's use of neg-ative inferences, I would refrain from deciding that issue and rule solely on the issue raised.

*Manifest necessity*

Because I conclude that defense counsel's inference was proper, the only basis for a mistrial was the extent to which defense counsel commented on facts that were not in evidence. However, even if defense counsel's actions in that respect were improper, I do not agree that they constituted a manifest necessity for a mistrial for three reasons.

First, a negative inference based on the failure to produce evidence is considered a particularly weak form of argument. For this reason, courts have held that "it is wiser to hold that if an argument on failure to produce proof is fallacious, the remedy is the answering argument and the jury's good sense." 2 Kenneth S. Broun, et al., *McCormick on Evidence* 225-26 (6th ed. 2006); *see also Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1152 (10th Cir. 1990); *Allen v. U.S.*, 603 A.2d 1219, 1227 (D.C. 1992). The circumstances here simply did not require the district court to intervene and thus infringe on the defendant's " 'valued right to have his trial completed by a particular tribunal.' " *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). In my opinion, the prosecutor did not meet his "heavy burden of justifying the mistrial in order to avoid the double jeopardy bar." *Hylton v. District Court*, 103 Nev. 418, 422, 743 P.2d 622, 625 (1987).

Generally, when courts have concluded that defense misconduct warranted a mistrial, it has involved behavior far more egregious than what occurred here. For instance, manifest necessity has been found by courts where: (1) defense counsel repeatedly refused to comply with the trial judge's admonitions and then proceeded to argue with the court in the presence of the jury, leading the jury to believe "that defense counsel was incompetent or unscrupulous," *U.S. v. Hoa Quoc Ta*, 221 Fed. App'x 938, 944 (11th Cir. 2007); (2) in violation of the court's order, the defendant published an advertisement in the geographic area from which the jury was drawn asserting his innocence and claiming that he was being persecuted by the State, *Reinstein v. Superior Court Dept. of Trial Court*, 661 F.2d 255 (1st Cir. 1981); (3) the trial judge believed that the defendant was responsible for arranging the murder of the prosecution's only witness in the middle of trial, *United States v. Mastrangelo*, 662 F.2d 946 (2d Cir. 1981); (4) the defendant perjured himself on the stand, *McKissick v. United States*, 379 F.2d 754, 761 (5th Cir. 1967); (5) defense counsel deliberately disregarded the judge's instructions and rulings, persisted in improper questioning, and was overheard by jurors stating that he would have the case transferred, resulting in several jurors expressing bias against the defense (one juror stated that "she had 'a 17-year-old that is more compliant than [defense counsel]' "), *U.S. v. Spears*, 89 F. Supp. 2d 891, 893-95

(W.D. Mich. 2000); (6) defense counsel repeatedly violated the court's pretrial order precluding reference to the victim's incarceration, asked questions after objections were sustained, made personal comments to the prosecution (including demeaning a female prosecutor), and withheld evidence from the State and then presented it in the defense's case-in-chief, *Quinones v. State*, 766 So. 2d 1165, 1166-67 (Fla. Dist. Ct. App. 2000); (7) defense counsel engaged in a pattern of inappropriate behavior that included becoming argumentative with potential jurors, becoming combative with the trial judge, asking irrelevant and bizarre questions of witnesses, and "deliberately destroy[ing the] trial by doing something that he knew to be inappropriate," *People v. Burtron*, 877 N.E.2d 87, 88-89, 93-94 (Ill. App. Ct. 2007); (8) the defendant skipped bail and was not present for trial, *Brown v. State*, 390 N.E.2d 1058, 1064 (Ind. App. 1979); and (9) in violation of a court order, defense counsel contacted multiple witnesses for the State and told them that they should not testify unless they received a grant of immunity, *State v. Fosse*, 424 N.W.2d 725, 727-30 (Wis. Ct. App. 1988).

Second, the district court had multiple alternatives to a mistrial. Both federal and state courts have consistently overturned a trial judge's decision to grant a mistrial because the trial judge failed to consider or apply a less drastic alternative. *See Johnson v. Karnes*, 198 F.3d 589, 596 (6th Cir. 1999) ("We further find it significant that the trial court judge failed to consider less drastic alternatives, but instead immediately decided that a mistrial was appropriate."); *Harpster v. State of Ohio*, 128 F.3d 322, 330 (6th Cir. 1997) ("Although the decision of a trial court to declare a mistrial based on potential juror bias is entitled to special respect, it would be an unreasonable application of the law, as established by Supreme Court precedent, to conclude that manifest necessity existed for a mistrial in this case . . . [because] a simple corrective instruction would have sufficiently protected against juror bias."); *Brady v. Samaha*, 667 F.2d 224, 230 (1st Cir. 1981) (concluding that the trial judge erred in failing to "consider any alternatives to a mistrial such as severance or curative instructions" (internal punctuation omitted)); *Dunkerley v. Hogan*, 579 F.2d 141, 147-48 (2d Cir. 1978) (concluding that while the trial judge did not act "impetuously," the fact that there was at least one alternative to the mistrial meant that it was not dictated by manifest necessity); *Jones v. Com.*, 400 N.E.2d 242, 251 (Mass. 1980) (concluding that severance was the appropriate remedy and that "[a]ppellate deference will be accorded the trial judge's discretionary determination that 'manifest necessity' exists only if the record reflects that the trial judge gave reasoned consideration to the various available alternatives . . . before declaring a mistrial"); *State v. Bertrand*, 587 A.2d 1219, 1226 (N.H. 1991) (reversing trial court's decision to grant a mistrial, noting that "[t]he alternatives to a mistrial were not discussed," stating that "more

consideration should be given to the alternatives to granting a mistrial than to the consequences of granting one,'' and directing the lower courts to exhaust alternatives before declaring a mistrial). As the Second Circuit Court of Appeals has aptly stated, the presence of even one reasonable alternative renders a decision to declare a mistrial unwarranted by manifest necessity. *Dunkerley*, 579 F.2d at 147-48.

In the present case, the court had several reasonable alternatives to declaring a mistrial. If the court was concerned that defense counsel had purposefully ignored the court's evidentiary rulings, it ''might have sent the jury out temporarily and have held the attorney in contempt.'' *State v. Frazier*, 555 A.2d 1078, 1086 (Md. Ct. Spec. App. 1989). Another alternative was to allow the State to reopen its case and present the evidence if it wished. Or the court could have given a curative instruction, as requested by defense counsel in this case.[3] Curative instructions present a particularly strong alternative to a mistrial given that, as this court has stated numerous times, we presume that a jury will follow jury instructions. *Lisle v. State*, 113 Nev. 540, 558, 937 P.2d 473, 484 (1997). Here, where the district court had multiple alternatives, the district court's decision to declare the mistrial was simply not dictated by manifest necessity.

Third, in this case the record suggests that the State may have sought a mistrial to bolster its case. Not only was the State able to preview the defendant's case, but in response to Glover's arguments at trial regarding the State's cancellation of the gunpowder residue test, the prosecution requested that testing shortly after the mistrial was granted. And in granting the mistrial, the district court specifically noted that ''this is a difficult and very close case.'' As such, the fact that the trial was near completion weighed against granting a mistrial because there was a danger that the mistrial was sought, at least in part, to permit the State the opportunity to improve its case against Glover. As the Supreme Court stated in *Washington*, the strictest scrutiny is applied in cases where the ''prosecutor requests a mistrial in order to buttress weaknesses in his evidence.'' 434 U.S. at 507-08.

---

[3]The majority asserts that an instruction directing the jury not to infer that defense counsel had seen the videotape would be a false instruction. However, the district court did not take time to fully consider a curative instruction and dismissed defense counsel's suggestion out of hand. This does not preclude the possibility that a satisfactory instruction could have been fashioned. The district courts frequently instruct juries to simply disregard improper or inadmissible comments. *See Valdez v. State*, 124 Nev. 1172, 1192, 196 P.3d 465, 478-79 (2008); *Pantano v. State*, 122 Nev. 782, 793, 138 P.3d 477, 484 (2006); *Hardison v. State*, 104 Nev. 530, 533, 763 P.2d 52, 54 (1988). More thought should have been given to a curative instruction before the district court found that the only reasonable alternative was to declare a mistrial.

In my view, the district court's decision to grant a mistrial after all of the evidence had been presented, based solely on defense counsel's inference in closing argument, severely infringed on the defendant's " 'valued right to have his trial completed by a particular tribunal.' " *Id.* at 503 (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). In the words of the First Circuit Court of Appeals, "Having carefully reviewed the entire record in this case, [I] conclude that the trial judge failed to engage in a scrupulous exercise of discretion in declaring a mistrial." *Brady*, 667 F.2d at 229.

### Conclusion

For the reasons stated above, I am unconvinced that there was a manifest necessity for a mistrial or that the ends of justice would have been defeated had the district court permitted the trial to continue. *See United States v. Perez*, 22 U.S. 579, 580 (1824). Therefore, I would grant the petition.